In re Norman and Rita F. GRUNDSTROM, Debtors.

WHITINSVILLE SAVINGS BANK, Melvin N. Nathanson, Plaintiffs,

v.

Norman and Rita F. GRUNDSTROM, Defendants.

Bankruptcy No. 4-81-00563-G.
Adv. Nos. 4-81-0265-G, 4-81-0242-G.

United States Bankruptcy Court, D. Massachusetts.

Oct. 26, 1981.

Alvin S. Nathanson, Nathanson & Goldberg, Boston, Mass., David H. Davidson, Tashjian, Simsarian & Wickstrom, Worcester, Mass., for plaintiffs.

Lawrence L. Bull, Southbridge, Mass., for defendants-debtors.

## MEMORANDUM ON COMPLAINTS FOR RELIEF FROM STAY

PAUL W. GLENNON, Bankruptcy Judge.

This memorandum and order concerns two separate complaints seeking relief from the automatic stay of § 362(a) of the Bankruptcy Code. 11 U.S.C. § 362. Pursuant to subsection (d)(1) of that section, the court may grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property." Section 362(d)(2) is not applicable here and will not be discussed. The two plaintiffs are a first and a second mortgagee on a residential property standing in the name of the defendants. The complaints have been consolidated for purposes of a decision, since the facts and issues of law are the same for each. Essentially, each plaintiff argues that although there may be equity in the property upon which they seek to foreclose, whatever equity may exist for the debtors is insufficient to provide the mortgagees with "adequate protection" as provided in § 362. The debtors' position is that there is substantial equity in their home, to which they are entitled to exempt up to $15,000 under § 522(d)(1). The debtors argue that a foreclosure sale seldom realizes any amount over and above the mortgage indebtedness, and therefore they seek continuation of the automatic stay in order to effect a private sale that will net some amount in excess of the mortgages.

In large measure the facts in this case are undisputed, except for the value to be attributed to the mortgaged property. The debtors filed for Chapter 7 relief under the Bankruptcy Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Reform act of 1978, P.L. 95–595 (1978), on July 8, 1981. Mr. Grundstrom is an unemployed insurance broker whose wife has been in ill health for several years. Mr. Grundstrom himself was totally disabled for at least one year, and partially disabled for a time thereafter before he eventually filed for relief under the Bankruptcy Code. Pursuant to her doctor's advice, Mr. and Mrs. Grundstrom have moved to Florida, and vacated their home in Massachusetts some time after filing for bankruptcy. The home had been listed with a real estate broker for at least four months prior to the filing date, and has remained on the market since that time. Thus, the property has been listed for sale for more than six months and is currently vacant.

The encumbrances against the property are also undisputed. The plaintiff Whitinsville Savings Bank holds a first mortgage on the home with a balance due as of the hearing date in the amount of $30,220.62, with interest accruing at the contract rate of 8½% per year. The plaintiff Melvin Nathanson holds a second mortgage on the same property with a balance due as of the hearing date in the amount of $9300, with interest accruing at a rate of 18% per year. In addition, Mr. Nathanson has paid an additional $378 to insure the home against fire loss, which amount has been added to the mortgage indebtedness. Finally, there were a variety of other liens against the property which have been discharged under § 522(f) of the Code by order of this court. Thus, the aggregate amount of encumbrances against the property total $40,522.62. By computing the principal balance of each mortgage and figuring in the contracted-for interest rate, the court has determined that interest is accruing on the two mortgages at a combined rate of $353.50 per month. In addition, taxes are accruing on the real estate at the rate of $100 per month. Finally, although both mortgagees have argued that the debtor's closing costs and broker's fee should be included in the court's determination of the amount of equity that exists, I decline to do so since those costs and commissions are personal obligations of the debtors and would not ordinarily be taxable against the real estate involved. A more appropriate charge would be the mortgagees' foreclosure costs, including an auctioneer's fee and advertising expenses which could be charged to the debtors' mortgage balance and collected out of the sale proceeds. However, no testimony or evidence was offered on that point and the court refuses to

speculate as to what those costs might be. Thus, the debt "picture" can be summarized by saying that the total encumbrances against the property in question are $40,-522.62, with charges against that property accruing at a rate of $453.50 per month.

The center of the dispute focuses on the reasonable fair market value to be attributed to this property. Since the term "value" has such elusive and illusory meaning, the court can only endeavor to make a reasonable estimate of value based upon expert testimony presented to it in court. In this case, the court has four "estimates" of value which range from $40,000 to $57,-500. Melvin Nathanson, the second mortgagee, based upon his 19 years of experience as a second mortgage equity lender, estimated the value of the home to be somewhere "in the low to mid-$40's". I assume this to mean between $40,000 and $46,500. Alvin Krom, a mortgage officer with the Whitinsville Savings Bank, based on his 17 years experience as a mortgage loan officer, estimated the value to be "in the low 50's", which I take to mean between $50,000 and $53,500. Robert Larson, the debtors' real estate broker with whom the property has been listed for the last six months, estimated the value of the home to be between $55,000 and $57,500. Lastly, the Town of Grafton, based on an assessment made in 1975 and subsequently adjusted in 1980 for 100% valuation, assessed the property's value at $47,900. Discounting the accuracy of Mr. Nathanson's estimate because of his own self-interest and the fact that the Bank's own officer recognized value in excess of $50,000, the court finds that a reasonable value range for this property is somewhere between $48,000 and $55,000. Taking into account the unrebuttled testimony of Mr. Larson that real estate in Grafton generally sells well in excess of its assessed value, but tempering that factor with the knowledge that the current real estate market is severely depressed due to existing economic and credit conditions, the court finds that a reasonable estimate of the fair market value of the debtor's home is $52,000. By deducting from that figure the total amount of encumbrances against

the property, with no allowance for foreclosure costs, the court finds that the reasonable estimate of equity for the debtors is $11,978, or a 23% "equity cushion". The question for decision, then, is whether a 23% "equity cushion" is sufficient adequate protection under all the circumstances, to warrant continuation of the automatic stay.

Adequate protection is nowhere defined in the new Bankruptcy Code. However, Section 361 sets forth three possible means of providing such protection if required under § 362. The first provides for court-ordered periodic payments to the extent that the stay results in a decrease in the value of an entity's interest in such property. Because the debtors currently have no regular source of income, this possible solution is of no practical value. A second alternative is to provide a replacement lien to the extent the stay impairs the value of the mortgagee's interest, but that too has no application here, since there has been no showing that the debtors own any unencumbered assets which might be available for such a lien. Therefore, the debtors seek to use their "equity cushion" as adequate protection under § 361(3).

The concept of providing adequate protection in the form of an "equity cushion" has been used often. *In re Blazon Flexible Flyer, Inc.*, 407 F.Supp. 861 (N.D.Ohio 1976); *In re Pitts*, 2 B.R. 476, 5 B.C.D. 1129 (Bkrtcy.C.D.Cal.1979); *In re 5-Leaf Clover Corp.*, 6 B.R. 463 (Bkrtcy.S.D.W.Va.1980); *In re Rogers Development Corp.*, 2 B.R. 679, 5 B.C.D. 1392 (Bkrtcy.E.D.Va.1980); *Matter of Lake Tahoe Land Co., Inc.*, 5 B.R. 34, 6 B.D.C. 262 (Bkrtcy.D.Nev.1980); *In re Tucker*, 5 B.R. 180, 6 B.C.D. 699 (Bkrtcy.S. D.N.Y.1980); *In re Ray Heid, Inc.*, 13 B.R. 171, 7 B.C.D. 1198 (Bkrtcy.D.N.M.1981); see generally, 2 *Collier on Bankruptcy* ¶ 361.-02[3] at p. 361–9 (15th Ed. 1979). The equity cushion concept arose prior to the institution of the Bankruptcy Reform Act of 1978, but has been carried over under the "catch-all" clause of § 361(3), which states that adequate protection may be provided by "granting such other relief ... as will result in a realization by such [mortgagee] of

the indubitable equivalent of such [mortgagee's] interest in such property." 11 U.S.C. § 361(3). This provision has allowed bankruptcy judges to exercise sound discretion in fashioning protective remedies according to the facts of each case.

Although an "equity cushion" in and of itself may constitute adequate protection within the meaning of § 362(d)(1), *In re Rogers Development Corp.*, supra, it has been held that the amount of the cushion is only one factor in the determination of whether to grant relief from the automatic stay. *In re Tucker*, supra.

In *Tucker*, an equity cushion of 7.4% (defined as the ratio of equity to fair market value) was found inadequate to warrant continuing the automatic stay. In addition to the equity cushion, however, the court also considered the rate at which the cushion was decreasing (through depreciation and mounting interest charges), the lack of any indication that the property was appreciating, and the fact that there was no insurance on the property in case of loss. In that case, as here, the security for the debt was a single-family residence, which had also been on the sale market for more than six months. The *Tucker* court, after considering all of the factors I have noted, concluded that the possibility of a reasonably prompt sale under the then existing market conditions for more than all encumbrances and costs was both remote and too speculative to warrant further jeopardy to the creditor while the equity cushion decreased.

The comparisons between the *Tucker* case and the Grundstroms are too close to ignore. Nevertheless, the distinctions between the two are such that the court must make note of them. The Grundstroms equity cushion is substantially larger than was evident in the *Tucker* case. Moreover, the rate of decline is such that almost 18 months could elapse before the equity would be completely lost. If that were the only consideration here, the Grundstroms would be entitled to continuation of the stay for at least a few more months, if not longer.

■ However, a number of factors are apparent which mitigate against that conclusion. First, we are talking here about residential property which is now vacant. That fact may make it difficult or even impossible to obtain adequate insurance on the property, not only for fire but also for vandalism and accidental loss. There was no indication at the hearing, for instance, whose responsibility it would be to make sure that proper heat is maintained at the premises during the oncoming winter months, for without heat pipes may burst. Nor was there any indication that Mr. & Mrs. Grundstrom are willing or even able to pay for the cost of maintaining heat. Moreover, since nobody is caring for the property at this time, the court must be concerned that the property may diminish in value. The lack of proper insurance, coupled with all those factors, creates exposure for the mortgagees in that they cannot be certain that the court's estimate of current fair market value may not change suddenly due to weather, vandalism or catastrophic accident. In other words, we are not concerned with the slow erosion of an equity cushion so much as the possibility of a sudden catastrophic loss which is uninsured and unrecoverable.

The second fact that concerns us is that traditionally winter is the worst time of year for residential home sales. Added to that fact is the current economic situation where interest rates are high and many would-be buyers have been priced out of the market. As such, the court is concerned that the Grundstroms may not be able to effect a private sale within any reasonably short period of time, and in fact may have to wait until well into 1982 before a sale might be realized. As I said before, from an equity aspect, such a delay would cause minimal harm to these mortgagees. However, in view of the substantial "exposure" of these mortgagees, to which the debtors have as yet offered no remedy, such a delay cannot be tolerated. In fact, one day of such "exposure" may be too long, because of the danger of substantial loss to the mortgagees' interest. This case makes it

clear that an "equity cushion" is not the only measure of economic risk to a mortgagee and where, as here, the economic risk to the mortgagees is substantial, the court has no choice but to grant relief from the automatic stay despite the debtors' substantial equity in the property. However, the granting of relief from stay only permits the mortgagees to proceed with whatever appropriate action is necessary in the state court to properly effect a foreclosure sale. In the interim period the debtors may continue their efforts at effecting a private sale. Moreover, the potential harm of which I have spoken could possibly be alleviated by the debtors through a variety of means. Insurance broad enough in coverage to protect the full value of each plaintiff's lien could be obtained, provided that such insurance covered a broad enough range of possibilities so that there is a substantial enough reduction of the risk of loss to the mortgagees. The best possibility might be an indemnity bond in the amount of $52,500. Perhaps a caretaker could be employed in conjunction with insurance coverage to reduce risks of vandalism and loss due to lack of attention to the property. Whatever possible solutions the debtors might propose, they will have only such time to effect them as it shall take the mortgagees to schedule a foreclosure sale. When that sale date is finally established, the court would then request counsel to schedule a hearing at least three days prior to that sale so that it might consider what steps the debtors have taken to remedy the problems which I have addressed and finally determine whether the foreclosure sale should proceed as scheduled. In this way the mortgagees can prepare to liquidate their claims as quickly as is possible, while the debtors shall have every opportunity either to sell their home or to take sufficient steps in the interim at providing adequate protection such that the court might consider reinstituting the stay.