**In re BOCA DEVELOPMENT ASSOCI-ATES a/k/a Boca Development Associates Ltd., Debtor.**

Bankruptcy No. 81 B 20683.
Adv. No. 82 ADV. 6087.

United States Bankruptcy Court,
S. D. New York.

July 14, 1982.

---

Robert A. Schatzman, Schatzman & Schatzman, P.A., Miami, Fla., for Theodore H. Miller, Trustee.

Reich & Reich, White Plains, N. Y., for debtor.

## DECISION ON COMPLAINT TO LIFT AUTOMATIC STAY

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The plaintiff, Theodore H. Miller, Trustee of Boca Grande Associates Trust, the mortgagee in this adversary proceeding, seeks relief from the automatic stay imposed when the debtor filed its Chapter 11 petition. The plaintiff's objective is to be permitted to commence a mortgage foreclosure action against the debtor's property in Palm Beach County, Florida. The debtor is a limited partnership consisting of two corporate general partners and various individual limited partners. The property in question involves approximately 31.44 acres of unimproved land located in Palm Beach County, Florida encumbered by the plaintiff's duly recorded mortgage in the principal amount of $725,000, exclusive of interest and charges.

## FINDINGS OF FACT

1. On November 30, 1981, the debtor, Boca Development Associates, a limited partnership, filed with this court a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* and has remained in possession of its property as a debtor in possession in accordance with 11 U.S.C. § 1108.

2. The debtor's major asset consists of approximately 41 acres of vacant and unimproved land, divided into seven parcels, five of which are encumbered by the plaintiff's mortgage and comprise a total of 31.44 acres. The land is located in Western Palm Beach County, Florida, in the Boca Raton West area, and has a zoning classification of AG–1, agricultural use. This zoning classification permits one residential dwelling per five acres of property.

3. On May 15, 1980, the debtor purchased the 31.44 acres in question from the plaintiff for the sum of $1,000,000, by paying $250,000 in cash and executing a mortgage note for $725,000 secured by a duly recorded mortgage deed for this amount. The mortgage note and deed were subordinate to an existing mortgage held by Boca Grande, Inc. The note called for interest at the rate of 10 per cent per annum. During the first two years of the note, interest only was to be paid in four equal semi-annual payments of $36,250, with the first payment being due on November 15, 1980 and the last due on May 15, 1982.

4. The mortgage note dated May 15, 1980 also provided that "upon default in the payment of principal and/or interest when due, the whole sum of principal and interest remaining unpaid shall, at the option of the holders, become immediately due and pay-

able." The mortgage deed dated May 15, 1980, which covered the five lots comprising the 31.44 acres in question also contained a default provision but allowed for a grace period of fifteen days after the payment became due, using the following language:

"Any sum of money herein referred to be not promptly paid within fifteen (15) days next after the same becomes due, or if each and every the agreements, [sic] stipulations, conditions and covenants of said note and this mortgage, or either, are not fully performed, complied with and abided by, then the entire sum mentioned in said note, and this mortgage, or the entire balance unpaid thereon, shall forthwith or thereafter, at the option of the mortgagee, become and be due and payable, anything in said note or herein to the contrary notwithstanding. Failure by the mortgagee to exercise any of the rights or options herein provided shall not constitute a waiver of any rights or options under said note or this mortgage accrued or thereafter accruing."

5. The debtor paid the first semi-annual installment of $36,250 to the plaintiff on November 15, 1980, as required but made no further payments thereafter to the plaintiff as required under the May 15, 1980 mortgage note and deed.

6. On May 19, 1981, the debtor and the plaintiff-mortgagee entered into an amended mortgage note in order to adjust for the failure of the debtor to comply with the terms under the original mortgage. The plaintiff-mortgagee agreed to abate the interest payment of $36,250 due on May 15, 1981 until November 15, 1981. The new mortgage note, dated May 19, 1981, increased the interest rate to 12 per cent per annum and required that during the first year of the note, interest only was to be paid in one installment of $80,000 on November 15, 1981 and one installment of $43,500 on May 15, 1982. As in the case of the original mortgage note, it was provided that "upon default in the payment of principal and/or interest when due, the whole sum of principal and interest remaining unpaid shall, at the option of the holders,

become immediately due and payable." The note also provided that upon default, interest "shall be at the highest rate available under Florida law."

7. The debtor failed to make the $80,000 payment on November 15, 1981, as required under the note that was executed on May 19, 1981. The plaintiff-mortgagee thereafter sent a telegram to the debtor, dated November 16, 1981 to the effect that in view of the debtor's default the plaintiff-mortgagee "has chosen to accelerate the entire principal amount pursuant to the terms of the mortgage." The debtor then filed its petition for relief under Chapter 11 of the Bankruptcy Code on November 30, 1981; fourteen days after receipt of the November 16, 1981 telegram from the plaintiff-mortgagee. The fourteen day period is significant because the debtor claims that under the mortgage deed it had a 15-day grace period after notice of default so that the mortgage could not be treated as having been accelerated at the time the Chapter 11 petition was filed. The plaintiff-mortgagee asserts that both mortgage *notes* did not provide for any grace period after notice of default, notwithstanding the 15-day provision in the mortgage *deed*, and even if a 15-day grace period applied, the filing of the Chapter 11 petition on the fourteenth day after notice of default did not automatically stay the acceleration of the mortgage note the day after the Chapter 11 petition was filed.

8. The debtor's financial woes were in large measure attributable to the fact that when it purchased the property in question it believed that the agricultural zoning restriction applicable to the vacant land could be changed to permit commercial usage, since the debtor intended to construct a shopping center at that location. The debtor filed an application approximately two years ago to change the zoning of the area to allow commercial usage. In the summer of 1980, the Palm Beach County Planning Commission, sitting as the Zoning Authority, approved a zoning change in accordance with the debtor's application. However, a Homeowner's Association objected and

obtained a reversal of the Zoning Authority's ruling.

The appeal of the reversal was never decided on the merits; therefore the debtor is attempting by its application filed April 15, 1982, to amend the Palm Beach County Comprehensive Land Use Plan to permit commercial development in this area. Although the Comprehensive Plan is not in effect (the current zoning ordinance allows one unit per 5 acres, while the Comprehensive Plan provides for three units per acre), the debtor offered testimony at the hearing held in this court on July 8, 1982 which indicated that zoning is often modified in accordance with proposed Land Use Plans. Thus, the debtor seeks to change the Comprehensive Plan to facilitate commercial development in the hope of effectuating a corresponding change in the zoning ordinance.

9. The County Planning Commission will meet on July 28, 1982. If it agrees to change the Comprehensive Plan to accommodate commercial development in the subject area, the debtor would then request that the Zoning Authority "upzone" the area to the level of usage permitted in the Comprehensive Plan. The application procedure could extend into November/December of this year, according to the testimony of Mr. Wolf, an attorney retained by the debtor in May, 1980 to represent its interests during the course of the zoning application procedure.

10. If the debtor fails in its efforts to obtain a modification of the Comprehensive Plan for commercial development, it would still proceed with an application requesting a rezoning of the subject property to at least match the density currently provided for in the Comprehensive Plan, i.e. three units per acre.

11. In the interim the plaintiff-mortgagee was required to pay real estate taxes to Palm Beach County for the year 1980 in the sum of $6,857.52. The plaintiff-mortgagee also made payments to Boca Grande, Inc. on the underlying mortgage in the sum of $64,-987.26, although there is no evidence that the debtor is liable for these payments.

The 1981 real estate taxes have not been paid. Interest payments required under the mortgage have not been met. The plaintiff-mortgagee has also paid attorneys' fees of $10,000 in collection efforts, as well as appraisal fees and miscellaneous expenses.

12. Unless and until the debtor is able to obtain a change permitting commercial use or three dwelling units per acre, it cannot plan for an effective reorganization. The debtor has produced no prospective financiers who are willing to invest under the current requirements of one dwelling per five acres. Thus, it has not been able to file any plan of reorganization since it first filed its Chapter 11 petition on November 30, 1981. The debtor is optimistic that it will be able to obtain formal approval from the Board of County Commissioners by December, 1982, after which time the debtor hopes to be in a position to arrange for financing so as to allow it to file a plan of reorganization.

13. The amount of the plaintiff-mortgagee's secured claim includes the unpaid $725,000 principal indebtedness, together with accrued interest. The unpaid interest includes the $80,000 that was due and not paid on November 15, 1981. The plaintiff-mortgagee computes the interest after the default on November 15, 1981 at 25%, which is the maximum rate allowable in Florida on amounts in excess of $500,000. For the period November 15, 1981 to July 8, 1982, the interest at 25 per cent per annum totals $116,696.30 and accrues thereafter at a per diem amount of $496.58. Hence, the total indebtedness on this basis exceeds $923,000. The debtor concedes that the principal balance of $725,000 has not been paid; that the $80,000 interest payment due on November 15, 1981 was not paid and that the plaintiff-mortgagee paid $6857.52 for 1980 taxes and that 1981 taxes have not been paid. Therefore, even without computing interest accrued from November 15, 1981, the plaintiff-mortgagee's claim exceeds $818,000.

14. The plaintiff-mortgagee's real estate expert valued the 31.44 acres at $25,000 per acre, for a total of $786,000. However, 5.44

acres were dedicated to the County, although the deeds given by the debtor were supposed to have been held in escrow by the County. The value of 5.44 acres, at $25,000 per acre would amount to a total of $136,-000. However the plaintiff's mortgage lien continues to cover any such dedicated property. Therefore no deduction should be made from the value of the secured collateral. This valuation was based on a highest and best use of the property in question, allowing for one dwelling per five acres as is permitted at the present time. The estimate was based on comparable sales in the area, although these sales were not sales of 5-acre estates, but rather acreage sales of agricultural plots.

That the property's present value of $786,000 is less than the $1,000,000 that the debtor originally paid is due to the fact that real estate values in general and in Palm Beach County in particular, have suffered. Both experts who testified agreed to this fact. The plaintiff-mortgagee's expert said that the reduction was generally around 25 per cent. Thus, his $786,000 value for the property is consistent with the 25 per cent reduction in real estate values.

15. The debtor's real estate expert submitted two valuations; one at $90,000 per acre, totalling approximately $3,600,000, based on a commercial zoning allowance. However, this figure must be disregarded since the property does not now have a zoning authorization for commercial purposes. The other estimate was at $37,-000.00 per acre, for a total of approximately $1,200,000. This estimate was based upon a highest and best use of three residential units per acre, despite the fact that the present authorization is for only one dwelling unit for each five acres. Thus, this estimate anticipates that the debtor will be successful in achieving a change in the current restriction of one unit per five acres. The debtor's expert also used "comparable" sales. However, of the six "comparable" sales examined, five examples involved parcels that had improvements within the sites, such as sidewalks, underground utilities, street lighting and roads. The debtor's property has none of these improvements within the site. The sixth "comparable" was a sale of 41 acres of property in the same development where the debtor's 31.44 acres are located. This sale occurred in May, 1980 at $24,400 per acre, which is substantially similar to the plaintiff-mortgagee's evidence of $25,000 per acre. The other five "comparable" sales with internal improvements within the parcels were sold at the following rates: $19,250.00 per acre, $24,019.00 per acre, $29,091.00 per acre, $39,400.00 per acre and $40,114.00 per acre. Thus, the debtor's expert selected the highest sale price of all of the so-called "comparables." He chose to disregard the fact that Lots 14 and 15, consisting of unimproved land in the same development as the debtor's property recently sold for less than $24,000 per acre.

16. Based on the evidence, the court finds that $25,000 per acre is a fair and reasonable value for the debtor's property and that the total value amounts to $786,-000, as contrasted with the indebtedness to the plaintiff-mortgagee in excess of $818,-000. Therefore, the debtor lacks equity in the property.

17. It appears that no plan of reorganization can be promulgated unless and until the debtor succeeds in changing the current development restriction from one dwelling per five acres to 3 units per acre. Even if the debtor can achieve this change, the earliest that this might occur is late November or early December, 1982. Thereafter, the debtor will have to seek financing to support any proposed residential development. The debtor does not have any financial prospects at this time other than optimistic expectations. However, high hopes do not equate with the need to show that an effective reorganization is likely. Although a reorganization contemplated along the lines anticipated by the debtor is not impossible, such possibility does not amount to proof that an effective reorganization is likely in the near future.

18. The plaintiff-mortgagee requested at the close of the case that based upon the evidence presented, the automatic stay be

lifted for the limited purpose of allowing for the commencement of its foreclosure action and that such lifting of the stay should continue up to the point of sale. The plaintiff-mortgagee suggested that no foreclosure sale be allowed without a further hearing and approval from this court.

## DISCUSSION

### Acceleration of Indebtedness

The first point for consideration is whether or not the entire mortgage indebtedness was accelerated as a result of the plaintiff-mortgagee's written notice of default on November 16, 1981, fourteen days before the filing of the Chapter 11 petition. The mortgage deed provided that the entire unpaid balance became due forthwith, or at the option of the mortgagee if a mortgage installment "was not promptly paid within fifteen (15) days next after the same becomes due . . .". However, this 15-day period was not recited in either the original mortgage note, dated May 15, 1980 nor in the amended note dated May 19, 1981. Both notes provided that upon default in the payment of an installment when due, "the whole sum of principal and interest remaining unpaid shall, at the option of the holder, become *immediately* due and payable." [Emp. added] The plaintiff-mortgagee exercised his option when he gave written notice of default on November 16, 1981.

The debtor's reliance on the 15-day period in the mortgage deed is misplaced for several reasons. Firstly, the debtor's liability is defined by the terms of the note. The mortgage deed merely secured the indebtedness created under the note. Therefore the terms of the note control as to liability.

Secondly, under the language as expressed in the deed, the debtor had a grace period of 15 days after a payment date to make the payment to cure the default. The mortgagee was not required to wait 15 days before giving notice of default and acceleration. Once such notice is given and absent a curing of the default within 15 days after the due date, "the entire balance unpaid

thereon, shall forthwith or thereafter, at the option of the mortgagee, become due and payable . . .". The plaintiff-mortgagee exercised his option by declaring the entire unpaid balance immediately due and payable on November 16, 1981. There was no provision in the mortgage deed for a 15-day waiting period after November 16, 1981.

Thirdly, the automatic stay imposed under 11 U.S.C. § 362 did not toll any 15-day grace period under the mortgage deed even if this court accepted the debtor's position that an acceleration did not become effective until 15 days after the November 16, 1981 notice. Code § 362(a) governs the scope of the automatic stay in bankruptcy cases. It stops the commencement or continuation of proceedings against the debtor to collect prepetition claims, enforcement of judgments, acts to obtain possession of property, the creation, perfection and enforcement of liens, collection activity, the setoff of prepetition obligations and Tax Court proceedings. There is nothing in Code § 362(a) that tolls the running of time limitations or grace periods allowed to the debtor to cure defaults in payment. For tolling purposes the debtor in possession or a trustee in bankruptcy must look to Code § 108(b), which provides for an additional 60 days to take action after the order for relief was entered. See *Bank of the Commonwealth v. Bevan*, 13 B.R. 989, 7 B.C.D. 557 (D.C.E.D.Mich., 1981). That 60-day period has long since expired, and at no time since the commencement of this case did the debtor ever make any effort to cure any default. If the debtor was willing and financially able to decelerate the mortgage debt it could have resorted to the provisions authorized in Code § 1124, including curing all defaults and compensating the plaintiff-mortgagee for any damages incurred as a result of reasonable reliance on the acceleration. As of this moment, the indebtedness must be regarded as having been accelerated for purposes of evaluating the plaintiff-mortgagee's request for relief from the automatic stay.

*Relief From the Stay*

Pursuant to Code § 362(g) the debtor has the burden of proof on all issues except on the question of equity in the property. The plaintiff-mortgagee has the burden of proof as to this issue and has sustained that burden by establishing that the debtor has no equity in the property at this time. The mortgage debt exceeds $818,000, whereas the property which serves as security for the debt is valued at $786,000.

 Relief from the automatic stay is governed by Code § 362(d) which specifies two basic grounds: (1) cause, including lack of adequate protection of an interest in property, or (2) the debtor lacks equity in the property and it is not necessary to an effective reorganization. An "effective" reorganization means more than just that the debtor needs the property. As was said in *In re Saint Peter's School*, 16 B.R. 404, 408–409 (Bkrtcy.S.D.N.Y.1982):

"If all the debtor can offer in response to a request for relief from the automatic stay is the hope that sometime in the future some purchaser may appear on the horizon with a sufficiently substantial offer to support a plan of reorganization, it cannot be concluded that an 'effective' reorganization is likely. *In re Terra Mar Associates*, 3 B.R. 462 (Bkrtcy.B.C.Conn.1980); *In re Hutton-Johnson Co. Inc.*, 6 B.R. 855 (Bkrtcy.B.C.S.D.N.Y.1980); *In re Riviera Inn of Wallingford, Inc.*, 7 B.R. 725 (Bkrtcy.B.C.Conn.1980); *In re Clark Technical Associates, Ltd.*, 9 B.R. 738 (Bkrtcy.B.C.Conn.1981).

██ In this case, the debtor lacks equity in the property and has high hopes that it will be able to change the present zoning restrictions affecting the secured property. It does not have any prospects for present financial restructuring nor has it filed a plan of reorganization since the Chapter 11 petition was filed on November 30, 1981. The debtor can only seek refinancing if it is able to obtain a zoning change. However, even if it could succeed in achieving the desired zoning change, there is no proof that financing will be available. Therefore, the debtor has not established that an "ef-fective" reorganization is likely within the meaning of Code § 362(d)(2).

This is not a case where the property produces income (it is unimproved vacant land), where taxes are paid by the debtor, and where the secured creditor's interest will not erode with the passage of time as in *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (B.C.S.D.N.Y.1982). Moreover, in the absence of a showing that the value of the collateral exceeds the amount of the claim (the so-called equity cushion) it cannot be argued that the value of the property alone should suffice for the purpose of adequately protecting a secured claim holder during the period in which the automatic stay continues in effect. At times the presence of such an equity cushion has been regarded as adequate protection. *In re Pitts*, 2 B.R. 476 (Bkrtcy.C.D.Cal.1979) (15% cushion was acceptable); *In re Rogers Development Corp.* 2 B.R. 679 (Bkrtcy.E.D.Va.1980) (17% cushion was satisfactory); *In re Castle Ranch of Ramona*, 3 B.R. 45 (Bkrtcy.S.D.Cal.1980) (1.8% cushion was inadequate); *In re San Clemente Estates*, 5 B.R. 605 (Bkrtcy.S.D.Cal.1980) (65% cushion was adequate); *In re Lake Tahoe Land Co.*, 5 B.R. 34 (Bkrtcy.Nev.1980) (40–50% cushion was required for lenders on undeveloped land, as in the instant case); *In re Tucker*, 5 B.R. 180 (Bkrtcy.S.D.N.Y.1980) (7.4% cushion inadequate for a junior mortgagee); *In re Xinde International, Inc.*, 13 B.R. 212 (Bkrtcy.Mass.1981) (50% cushion was adequate protection); *In re Grundstrom*, 14 B.R. 791 (Bkrtcy.Mass.1981) (23% cushion was inadequate because the house was not properly insured and the resale market was depressed); *Commonwealth of Pa. State Employees' Retirement Fund v. Roane*, 14 B.R. 542 (E.D.Pa.1981) (33% cushion was adequate if the debtor continued making mortgage payments).

██ In this case, the taxes continue to accrue, and the entire principal indebtedness is due. No mortgage payments have been made by the debtor since the first payment of $36,250 was made on November 15, 1980. No income is derived from the unimproved vacant land. The debtor has

not offered the plaintiff-mortgagee any periodic payments or additional liens which might serve as adequate protection within the examples listed in Code § 361. Accordingly, it must be concluded that the plaintiff-mortgagee lacks adequate protection for its interest in the encumbered property in question.

## CONCLUSIONS OF LAW

1. The plaintiff-mortgagee lacks adequate protection for its interest in the property in question within the meaning of Code § 362(d)(1).

2. The debtor does not have any equity in the property in question and such property is not necessary to an effective reorganization, within the meaning of Code § 362(d)(2), since no reorganization is likely within the near future.

3. The plaintiff-mortgagee is entitled to the relief requested. Therefore, the automatic stay imposed under Code § 362(a) is modified so as to allow the plaintiff-mortgagee to proceed with its foreclosure action. However, no sale shall take place without further order of this court upon notice and a hearing, as defined under Code § 102(1).

SUBMIT ORDER ON NOTICE.