**In re POWERS AERO MARINE SERVICES, INC., Debtor.**

**POWERS AERO MARINE SERVICES, INC., Plaintiff,**

v.

**MERRILL STEVENS DRY DOCK COMPANY, Defendant,**

**First National Bank of Oklahoma City, Intervenor.**

**FIRST NATIONAL BANK OF OKLAHOMA CITY, Movant,**

v.

**POWERS AERO MARINE SERVICES, INC., Respondent.**

Bankruptcy No. 83–05548–H2–5.
Adv. No. 84–0132–H1.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Sept. 5, 1984.

Kaaran E. Thomas, Vinson & Elkins, Houston, Tex., for Merrill Stevens Dry Dock Co.

Henry J. Kaim, Sheinfeld, Maley & Kay, Houston, Tex., for First Nat. Bank of Oklahoma City.

Jack D. Nolan, Houston, Tex., Richard N. Tilton, Whitman & Ransom, New York City, for Powers Aero Marine.

## MEMORANDUM OPINION

MANUEL D. LEAL, Bankruptcy Judge.

Two actions are before this court, both dealing with the disposition of the debtor's yacht, the Jan Pamela II. The debtor, Powers Aero Marine, filed a complaint to compel turnover of the yacht, pursuant to 11 U.S.C. Section 543, currently being held in drydock, on January 16, 1984. Subsequently, a secured lender, the First National Bank of Oklahoma City (Bank) filed a motion for relief from the automatic stay under 11 U.S.C. Section 362. These two causes were consolidated for administrative purposes.

The debtor corporation was formed in 1979 for the purpose of procuring the Jan Pamela II. The yacht was purchased for $800,000 by the debtor. Some time thereafter, the debtor had the yacht taken into drydock in Miami, Florida for extensive renovations. These were completed and the yacht was released. The Jan Pamela II was then equipped with state of the art electronics and an on-board heliport. Also included were two major staterooms and two smaller cabins, all lavishly decorated.

During its time at sea, the yacht was principally used by the debtor's sole equity security holder, Melvin Lane Powers (Powers). According to testimony, the yacht was utilized as a device in Powers' real estate practice to serve as a bonus for a tenant's long-term leasing of large blocks of space. The mechanism was used in or-

der to induce occupancy in Powers' real estate business unrelated to the debtor, Powers Aero Marine Services, Inc. Brochures and posters were distributed offering this inducement. Powers testified that it is common for lessors to give free rent when they can secure a two year lease. He stated it was his practice that when securing a major tenant for his real estate business, to give time on the debtor's yacht in direct relationship to the length of the lease.

It appears that the debtor was never involved with the decision-making process as to the use of its yacht. In fact, during the five years of incorporation by the debtor, there has never been a formally scheduled meeting of the debtor's board of directors, nor have minutes ever been taken of any informal meeting.

It is important to note that at no time during the yacht's years of service, however limited they were, did the debtor ever account for the use of the Jan Pamela II by its equity security holder or Mel Powers Investment, Inc. In fact, Powers stated that there was no need for such an accounting, because it was all one company. He saw no need to pass funds from one company to another, when the money was coming out of the same pocket.

During this post-1979 renovation period the yacht was chartered on a limited basis as well. On six occassions, the Jan Pamela II was chartered on a week-to-week term. These charters were usually by families, known by or associated with Powers, and once by the Crown Prince of Saudi Arabia. The fees for such charters ranged from $35,000 to $45,000 per week.

Sometime in the fall of 1982, it was determined by someone connected with the debtor that the yacht should once again go into dry dock for extensive structural alterations. Specifically, it was decided that the yacht should be severed and that a 21 foot section should be added, bringing the yacht to an overall length of 165 feet. This decision was apparently made by Powers, himself. It is not known for sure, for as stated above, there are no minutes of any meeting of the debtor corporation. In any event, no satisfactory reasons were elicited for this major modification to the yacht.

The originally contracted price and estimated time for completion of the modifications to the yacht were $1 million and five months, respectively. Elicited testimony established that the debtor had made payments totaling approximately $800,000. However, at this time, the funds necessary for completing the alterations to the yacht exceed $1.8 million. The additional charges seem to have been ratified by the yacht's captain, Norman Dahl. This outstanding balance is the basis of the maritime lien held by the defendant in the turnover action, Merrill Stevens Drydock Company, and the subject of their arrest of the yacht. The Jan Pamela II was subsequently arrested by the United States District Court for the Southern District of Florida and Merrill Stevens was named as custodian to serve in *custodia legis.*

The debtor filed its application for turnover of the yacht pursuant to §§ 542 and 543 of the Bankruptcy Code. On preliminary motions, this court determined that the defendant was in fact a custodian of the property and therefore, § 543 was the applicable section to the cause of action. At the same preliminary hearing, Merrill Stevens challenged this court's jurisdiction and its abstention power. Merrill Stevens urged that this court abstain from the adversary proceeding by virtue of § 305.[1] It

---

1. Section 305 provides:

(a) the court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension; or

(2)(A) there is pending a foreign proceeding; and

(B) the factors specified in section 304(c) of this title warrant such dismissal or suspension.

(b) A foreign representative may seek dismissal or suspension under subsection (a)(2) of this section.

further urged that this court was without jurisdiction to hear the matter since another court, The United States District Court for the Southern District of Florida, has already taken jurisdiction of the yacht. This second argument was on the basis of *in rem* jurisdiction and that case law established that a court "first in time" takes authority away from the Bankruptcy Court. This court determined that it would not abstain from the matter by way of § 305 and deferred ruling on the jurisdictional issue until the hearing on the merits of the turnover action.

Intervention of the secured lender, First National Bank of Oklahoma City, was allowed in the turnover proceeding on behalf of the defendant. At the same time, the court ordered joinder of the Bank's motion for relief from the automatic stay because the defense in the turnover action and the assertions in the relief from stay have questions of law and fact in common.

DISCUSSION:

■ Subsection 543(b) absolutely requires a custodian to deliver to the bankruptcy trustee, or debtor-in-possession, where no trustee has been appointed, any property of the debtor that is in the possession, custody or control of the non-bankruptcy custodian. However, subsection 543(d) permits the court to excuse a custodian's strict compliance with the turnover provisions of the Code in some cases. The standard and test to be applied by 543(d) is "if the interests of the creditors and if the debtor is not insolvent, the equity security holders, would be better served by permitting a custodian to continue in possession, custody, or control of such property". 11 U.S.C. § 543(d).

Application of 543(d) has been sparse, with a virtual dearth of case law on the subject. The test of the interests of creditors and its relative criteria has never been fully developed. Rather, the concept has remained broad and without much definition. *See generally,* Levin, *An Introduc-*

*tion to the Trustee's Avoiding Powers,* 53 Am.Bankr.L.J. 173 (Spring, 1979); *See also,* 9 Am.Jur. 2D *Bankruptcy* § 483 (1980).

The term "interests of creditors" is not defined in the Bankruptcy Code and is conspicuously absent in case law. The term "interest" is usually employed to denote a property right in land or chattel. Where a creditor holding a secured claim is involved, the term. may mean the secured creditor's rights in the collateral. More particularly, it means a right to have the advantage accruing from anything, a right in the nature of property, but less than title. However these definitions offer little guidance in applying § 543(d). Therefore, the meaning of this section and the test for its application will have to be developed on a case-by-case basis. At the very least, it can be said that requiring turnover cannot be calculated, or reasonably be foreseen, to be injurious to the creditors or oblivious to them. At the same time, this court must strike a balance between the often opposing tensions that exist between a debtor and its creditors, consistent with the Bankruptcy Code.

In *In re CCN Realty Corp.,* 19 B.R. 526 (Bkrtcy S.D.N.Y.1982), the court dealt with the question of a receiver in regards to the collection of rents from an adult home. The evidence showed that the state appointed receiver was the preferred choice to remain in control of the property since the debtor was derelict in collecting the rents. The home itself was not the debtor, but, rather the land management company that owned the real estate upon which the home was situated. The state court had appointed a receiver to collect $8600 in monthly rents. These payments continued for a period, but ceased in January, 1982 and the debtor was held in contempt for failure to remit the rentals. The debtor subsequently filed a petition for relief on March 12, 1982. At the time of the hearing the receiver was holding $60,000 in rentals.

---

(c) An order under subsection (a) of this section dismissing a case or suspending all proceedings in a case, or a decision not so to dismiss or suspend, is not reviewable by appeal or otherwise.

The debtor had filed for turnover of these funds and the secured lender objected.

Pointing to § 543(d), the court stated that the debtor had demonstrated no incentive to collect rents; it did not do so before the petition and nothing indicated it would do so afterward. "Only an overly optimistic visionary would expect the debtor to collect rents." *Id.*, at 529. The court found that the debtor's duty was to reduce the secured debt and that collection of rents goes to that purpose. "The custodian's continued collection and possession of the rents will ensure the observance of the distinction between the responsibilities of the debtor to its creditors and of the adult home to its mortgagees." *Id.* Finally, Judge Schwartzburg stated that "this is without prejudice to the debtor's right to apply subsequently for a turnover of the funds upon a showing that a reorganization is likely, that they are necessary for reorganization and they will be applied toward reorganization." *Id.*

In *Matter of WPAS, Inc.*, 6 B.R. 40 (Bkrtcy.M.D.Fla.1980), the court stated that 543(d) was enacted "to mollify the seemingly harsh and apparently inflexible requirements of 543(b)". *Id.*, at 43. In coming to the conclusion that the best interests of all must be considered, the court termed 543(d) as the codification of abstention as stated in § 305, which holds that the court may decline to entertain any controversy which otherwise would be within its judicial competence, if to do so would be in the best interest of all parties, although not necessarily the interest of the debtor. *Id.* Pointing to the many instances of mismanagement by the debtor, the court deemed it proper to allow the receiver to remain in possession. The court stated that future possession would lead to continued mismanagement and expected losses. *Id.*, at 44.

The *CCN Realty* and *WPAS* cases appear to enunciate the principle that in applying § 543(d), a court may consider: (1) whether reorganization is likely; (2) that funds are necessary for such a reorganiza-

tion and funds exist which will be applied towards it; and (3) mismanagement.

In the instant case, the court is dealing with related debtors. Simultaneous with the filing of the petition for relief of Powers Aero Marine, the principal of the debtor filed a petition for Mel Powers Investment, Inc. a/k/a/ Melvin Lane Powers a/k/a Mel Powers. This is necessary to note for, as stated above, the actions of the principal and transactions of the two debtors are interrelated.

The secured indebtedness on the Jan Pamela II is held by First National Bank of Oklahoma City, the movant in the motion for relief from stay and intervenor in the turnover action. The source of their secured claim is a transaction whereby the Bank made a loan of three million dollars ($3,000,000) to Mel Powers. It is significant that these monies were delivered to Mel Powers Investment, Inc. and not to the debtor, Powers Aero Marine. At no time were these funds ever directed, or intended to be directed, to the debtor. But, at the same time, it was always the intention that the note would be secured by the debtor's yacht. This transaction only serves to further illustrate the questionable liquidity of Powers Aero Marine and the propensity of its sole equity security holder to utilize the debtor's assets as a vehicle for his other business ventures.

Further, the physical state of the yacht, after its initial renovation and refurbishment and its intended condition once the current alterations are completed, lends credence to the idea that the Jan Pamela II is intended for the sole personal use and benefit of the debtor's sole equity security holder, Mel Powers. At the trial Powers' interior decorator testified of having decorated the yacht's interior consistant with Powers' personal preferences. The current redecoration has customized the yacht with such lavish features as gold-plated sinks and fur bedspreads. These accouterments go a long way towards establishing that this is a personalized yacht. Yachts that are maintained for bareboat charter are not so outfitted and furnished.

It has been the debtor's contention that the Jan Pamela II will be used for chartering purposes. The debtor maintains that this determination was made some time ago and that turnover is required for implementation of chartering for an effective reorganization. However, the licensing of the yacht must be on a characterized use basis. The Jan Pamela is licensed as pleasure craft and has never been licensed as a chartering yacht, bareboat or otherwise.

The debtor maintains that the Jan Pamela II, as now licensed, is capable of bareboat chartering. It asserts that the six instances of chartering establishes this point. This court does not accept such a proposition. The previous chartering has been conducted on an isolated basis with no sense of continuity. The market for chartering of yachts, relative in size to the Jan Pamela II, is depressed. The volume of activity within the available circle of clientele has been small and has caused many large chartering operations to be abandoned in favor of brokering. The debtor's inability to procure any firm offers for chartering evidences this depression, and establishes the unlikelihood of an effective reorganization at this time.

Regardless of the debtor's intention, application of the criteria, as enunciated in *CCN Realty* and *WPAS*, compels the court to look at the past state of financial obligations of Powers Aero Marine and the repercussions of its limited chartering business. Mismanagement of Powers Aero Marine is definitely apparent in that in the several years of the yacht's usage, the debtor's expenses and liabilities have outweighed its income by a four to one ratio. The yacht, according to the testimony, requires a crew of several persons that must be paid, fed and quartered. The yacht itself, as is the case with all yachts, requires frequent provisioning with supplies as well as constant maintenance. These are substantial fixed expenses demanding heavy expenditures of funds. It is conceivable that until the debtor is able to present the yacht in a workable condition, ready for charter, many additional funds will have to be expended, further diminishing an almost non-existent liq-

uid estate. Any additional funds necessary for the continued renovation and use of the Jan Pamela II will have to be transferred from the related debtor's estate, thereby thrusting additional priority claims onto the Powers Aero Marine estate to the detriment of creditors.

Additionally, consideration must also be given to the lack of administrative formalities of the debtor. Here, as in *CCN Realty*, the debtor has never maintained books, records or corporate minutes on an on-going basis. Whereas, in *CCN Realty, supra* at 529, the court determined that this presented a compelling need for a custodian to continue the collection and possession of rents, here, the informality of administrative machinations compels the court to refrain from removing the yacht from the custodian's possession. The ideas, intentions and directions of the debtor cannot be gleaned from the statements of so few. Without more information, a clear purpose of the debtor corporation cannot be determined.

Finally, it is relevant whether the property sought to be turned over will be used toward a successful reorganization of the debtor. Powers Aero Marine has proposed two hopeful ventures for rehabilitation through use of the Jan Pamela II. First, as stated above, the debtor suggests that the Jan Pamela II will be used in a chartering capacity. Second, the debtor has produced Dr. Nicholas Bachynsky to serve as a financier for Powers Aero Marine. Dr. Bachynsky and Powers have been acquainted for over ten years and their financial dealings have been varied and tended to be a bit unusual. For example, currently outstanding is a Powers' debt of $800,000 that is evidenced by nothing more than a handshake. As to the Jan Pamela II, Powers proposed to transfer a one-half interest in the yacht to Bachynsky in consideration for Bachynsky making necessary payments on debt service to the Bank and maintenance to Merrill Stevens. This scheme, fraught with many contingencies, would be utilized by Bachynsky, due to his $180,000 monthly cash flow, for certain personal income tax

benefits. There was little or no evidence that a newly formed partnership would continuously engage the yacht in chartering. On the contrary, the Jan Pamela II would be used for the pleasure cruising of its two principals.

This second proposal gives more credence to the notion that the debtor's newly conceived chartering venture was an afterthought, formulated to mollify the court. The expected use of the Jan Pamela II will not be towards rehabilitation and eventual successful reorganization. Whereas in *CCN Realty*, there existed identifiable income, here only speculation. The debtor has failed to demonstrate that the Jan Pamela II will be used for an effective rehabilitation that will realistically pay the current creditors. But, even if it had, the present status of the chartering business and the lack of a firm offers for chartering establishes that, at this point in time, a successful reorganization will not be realized. Thus, the planned use of the yacht towards reorganization is wishful thinking, unsupported by business evidence.

Applying the test of § 543(d) to the above restricted facts it is the opinion of this court that, it is not in the interest of creditors to have the Jan Pamela II turned over to the debtor-in-possession. Such a release would only serve to benefit the interests of the sole equity security holder to the detriment of all creditors. Because of the debtor's insolvency, consideration of the equity security holder's interest is precluded. The operation of the debtor as a conduit of Mel Powers does not call for this court to intercede. Requiring turnover would reasonably be foreseen to be injurious to the interests of the creditors. The interests of the creditors of the estate can only be served by having the custodian excused from strict compliance with the turnover provision of § 543.

The debtor has raised several claims against Merrill Stevens Drydock Company arising from the same transactions made the basis of the admiralty litigation. However, this Bankruptcy Court is restricting its determination to the core bankruptcy matters, since the litigants are already before a non-bankruptcy forum that can dispose of all other matters. To rule otherwise would only create further jurisdictional problems to the litigants and to the courts, all of which can be avoided by this court's abstention from the non-bankruptcy issues.

### § 362 Relief from Stay.

■ There is no doubt, based upon the testimony of all witnesses, that equity does exist in the yacht. Accepting either side's position of the indebtedness on the yacht and each appraiser's position as to its current value, this court finds that the debtor has a significant equity position in the yacht. Thus, the bank has not met its burden on this issue according to § 362(d)(2)(A).

As to the yacht being necessary for an effective reorganization, the debtor's contentions are not enough to establish its viability. In the recently decided case of *In re Harrow Leasing Corp.*, 35 B.R. 916, (Bkrtcy.E.D.Pa.1983), the court held that since no plan of reorganization is feasible then no property can therefore be necessary for an effective reorganization. *Id.*, at 923. The mere possibility of a reorganization "does not amount to proof that an effective reorganization is likely in the near future". *In re Boca Development Assoc.*, 21 B.R. 624, 628, (Bkrtcy.S.D.N.Y.1982). While this court is not passing judgment on the final confirmation of a plan of reorganization, at this point one is not feasible.

Most important is that the debtor is unable to overcome the substantial evidence as to cause and lack of adequate protection. For all the many instances of mismanagement and the interrelation yacht of the debtors as stated above, cause exists for the lifting of the automatic stay. At this point in time, the debtor, Powers Aero Marine, has virtually no liquid assets. Funds necessary to meet the expenses of maintaining the yacht's crew have been repeatedly transferred from the related debtor's estate. It is therefore impossible to structure an order fashioning some form of adequate protection in face of the large

monthly payments necessary to meet the secured indebtedness.

For the above stated reasons, the movant, First National Bank of Oklahoma City is free to exercise its rights under its security interest agreement with the debtor and as law and equity will allow.

Further, the movant is relieved from the automatic stay to enable it to take part in all litigation currently being undertaken in the United States District Court for the Southern District of Florida, sitting in Admiralty.

It is therefore ORDERED that the debtor's complaint to compel turnover is DENIED, and further ordered that the Bank's motion for relief from the automatic stay is hereby in all respects GRANTED.