In re TEXSCAN
CORPORATION, Debtor.

TEXSCAN CORPORATION, a Delaware corporation, Appellant,

v.

COMMERCIAL UNION INSURANCE COMPANIES, Appellee.

**BAP No. AZ–88–1896.**
**Bankruptcy No. B–85–3618–PHX–GBN.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 22, 1989.

Decided Nov. 30, 1989.

Virginia Barklow, Stretch, Land, Weeks, Cardon, Phoenix, Ariz., for appellant.

Gerald L. Shelley, Chris Kimble, Winston & Strawn, Phoenix, Ariz., for appellee.

Before JONES, RUSSELL and PERRIS, Bankruptcy Judges.

## OPINION

JONES, Bankruptcy Judge:

The Appellant, Texscan Corporation, appeals a bankruptcy court order denying its motion to reject an executory contract. We reverse.

## FACTS

Commercial Union Insurance Companies ("CUIC") and Texscan Corporation ("Texscan") entered into a contract called a Large Risk–Loss Dividend Plan ("Plan"). The Plan provided business coverage to Texscan through various workmen's compensation, comprehensive liability and automobile insurance contracts for claims arising from January 1, 1983 until January 1, 1986.

The Plan is modeled after a retrospective insurance premium contract. Under such a contract an annual premium, called a deposit premium or standard premium is estimated and paid in installments. After the inception of the contract, annual adjustments are made whereby actual losses are computed and then plugged into a mathematical formula to determine the actual premium for that adjustment period. Based on whether the estimated premium is too high or too low, an overpaid premium is refunded to the insured while an underpaid premium is paid to the issuer.

The first full adjustment occurred in June 1986 and covered the previous 12 months resulting in a premium return to Texscan of $42,054.00. Meanwhile, on November 22, 1985, Texscan filed a petition for relief under Chapter 11 of the Bankruptcy Code. Even though five weeks of coverage remained under the Plan, CUIC continued to fulfill its obligations by servicing the claims which arose during those final weeks. The adjustment process also continued and in June, 1987, the second full adjustment was made. The second full adjustment showed that in the 12 months since the first full adjustment CUIC paid out $97,823.00 on claims. These losses were plugged into the formula used to calculate retrospective premiums and after deducting the standard premium already paid, a deficiency of $114,892.00 remained. However, pursuant to the terms of the Plan CUIC is entitled to only $80,212.00 of the second full adjustment.[1] It is this premium of $80,212.00 which CUIC seeks to recover as a priority administrative expense through its proof of claim.

CUIC first appeared in this bankruptcy case on October 28, 1987 by filing an "Amended Administrative Expense Proof of Claim" ("Proof of Claim") and an "Application for Payment of Administrative Expenses Incurred by Commercial Union Insurance Companies" ("Application") on November 16, 1987. The aforementioned

---

1. Under the Plan, Texscan's maximum liability is $556,558.00. Any liability beyond that amount is to be borne by CUIC. At the time the second full adjustment was calculated, Texscan had already paid $476,376.00 in liability. Accordingly, a payment of $80,212.00 would bring Texscan to its premium ceiling. However, CUIC seeks to recover $90,212.00. This figure appears to be a simple addition-subtraction error on its part. Consequently, CUIC is entitled to seek only $80,212.00 of the $114,892.00 originally claimed.

pleadings were filed two years after Texscan's petition, 17 months after the expiration of the court-ordered bar date for the filing of claims and less than one month prior to the confirmation of the "Second Amended Joint Plan of Reorganization."

Nevertheless, on February 23, 1988, nearly two months after Texscan's plan of reorganization was confirmed by the bankruptcy court, CUIC's disputed Claim and Application was heard.[2] At that hearing, the bankruptcy court determined, *inter alia,* that: (1) even though the insurance coverage under the Plan expired on January 1, 1986, the Plan remained executory; (2) the Plan had not been specifically assumed or rejected; and (3) the Plan remained in some manner in force until a formal assumption or rejection was approved by the bankruptcy court.

In reliance on the bankruptcy court's rulings, Texscan filed a motion to reject the Plan. After a hearing on the matter, the bankruptcy court entered an order denying Texscan's motion as untimely.[3] Texscan timely appealed.

## STANDARD OF REVIEW

■ We review *de novo* the bankruptcy court's conclusions of law. *In re American Mariner Industries,* 734 F.2d 426 (9th Cir.1984); *In re New England Fish Co.,* 749 F.2d 1277, 1280 (9th Cir.1984); *In re Bialac,* 712 F.2d 426, 434 (9th Cir.1983).

## DISCUSSION

Although the term "executory contract" is not defined in the Bankruptcy Code, the legislative history of 11 U.S.C. § 365(a) states that executory contracts generally include contracts on which performance remains due to some extent on both sides. H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977). S.Rep. No. 989, 95th Cong., 20th Sess. 58 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5844, 5963, 6303.

The widely adopted "Countryman Definition" narrows the executory contract definition contained in the legislative history and generally provides that a contract is executory if the obligations of both the debtor and the non-debtor party remain so far unperformed that failure of either to complete performance would constitute a material breach excusing performance of the other. *See* Countryman, *Executory Contracts and Bankruptcy: Part 1,* 57 Minn.L.Rev. 439, 460 (1973); *In re Pacific Express,* 780 F.2d 1482, 1487 (9th Cir.1986).

■ In the instant case the Plan terminated by its own terms on January 1, 1986, five weeks after Texscan filed its petition. Yet, CUIC contends that the Plan is executory, arguing that the clause which provided for premium payments based on actual losses survived the petition. Thus, it follows, CUIC contends, that under the Plan the retrospective premium policies continued to impose obligations; for instance, were CUIC to cease to service the claims, it would be liable to Texscan for breach of contract, similarly, were Texscan to cease making premium payments it would be in default. This analysis was adopted by the bankruptcy court which relied on *In re Wegner,* 839 F.2d 533 (9th Cir.1988) and *In re Select-a-Seat,* 625 F.2d 290 (9th Cir.1980) in determining that the Plan was executory. In *Wegner,* the Ninth Circuit held that the duty to pay money on one side is a material obligation sufficient to render the contract executory where corresponding material obligations exist on the other side. 839 F.2d at 537. In *Select-A-Seat,* the Ninth Circuit held a particular licensing agreement executory. 625 F.2d at 293. The debtor in *Select-A-Seat* had entered into a worldwide exclusive licensing agreement with a non-debtor company. As part of the agreement, the debtor agreed to give a 20-year exclusive distribution right in return for $140,000.00 down payment plus five percent of annual net

**2.** The order confirming the plan contained the standard provision regarding executory contracts, which provided that Texscan assumed any executory contract which was not previously rejected and was not, as of the effective date of the plan, the subject of a pending motion to assume or reject.

**3.** Notwithstanding its February 23, 1988 ruling, the bankruptcy court determined, *inter alia,* that Texscan could not reject the Plan after the plan confirmation and that the Plan "rode through" the case and remained binding on Texscan.

return of the non-debtor, subject to five optional extensions of five years each. The court held the contract executory because performance owing on both sides was still substantial. Deductively, the bankruptcy court in the instant case held the Plan executory, concluding that Texscan and CUIC both had continuing obligations of performance thereunder. We disagree.

It is axiomatic that before 11 U.S.C. § 365 can apply a contract must exist. If a contract has expired by its own terms then there is nothing left to assume or reject. 2 *Collier on Bankruptcy* 365.02 at 365–14 (15th ed. 1981). In this case, the Plan required CUIC to indemnify all claims arising between January 1, 1983 and January 1, 1986. Consequently, since the Plan expired five weeks after the bankruptcy case commenced and before either party filed a 11 U.S.C. § 365(a) motion there was nothing for Texscan to assume or reject. In fact, CUIC's obligations to Texscan under the Plan were unaffected by the filing of Texscan's petition. Under applicable state law, notwithstanding Texscan's bankruptcy or the expiration of the Plan, CUIC was required to continue processing claims. Ariz.Rev.Stat.Ann. § 23–963 (1987). Section 23–963 reads in pertinent part:

> Every policy of insurance covering the liability of the employer for workers' compensation ... shall cover the entire liability of the employer to his employees covered by the policy or contract, and be deemed to contain the following provisions ...
>
> 4. That the insolvency or bankruptcy of the employer and his discharge therein shall not relieve the insurance carrier from payment of compensation for injuries or death sustained by an employee during the life of the policy or the contract.

Thus, regardless of Texscan's obligations, CUIC had an affirmative duty to Texscan and its employees to continue to provide coverage for the five weeks after Texscan filed its Chapter 11 petition. In addition, CUIC had an affirmative responsibility for the administration of covered claims thereafter. Accordingly, we conclude that the expired Plan was not executory and consequently could not "ride through" the bankruptcy case.[4]

### CONCLUSION

■ Contracts that expire by their own terms before a § 365(a) motion is brought or a plan of reorganization providing for assumption is confirmed cannot be assumed because there is nothing left to assume. Thus, such contracts are not executory. In addition, a prepetition obligation can not be converted into an administrative expense simply by operation of § 365. Accordingly, the judgment of the bankruptcy court is REVERSED and REMANDED for proceedings in accordance with this disposition.

---

4. Although not before us, the real issue in this dispute is whether CUIC's claim of $80,212.00 is an administrative expense. It appears that claims of insurance carriers based on injuries suffered by employees post-petition are administrative expenses under 11 U.S.C. § 503(b)(1)(A) but that claims of insurance carriers based on injuries suffered by employees pre-petition are not. *See Fireman's Fund Insurance Co. v. Wheeler–Pittsburgh Steel Corp. (In re Wheeling–Pittsburgh Steel Corp.),* 67 B.R. 620, 623 (Bankr. W.D.Pa.1986). On remand, the bankruptcy court shall determine what portion of CUIC's claim qualifies as an administrative expense.