**In re BALCO EQUITIES LTD., INC., Haddon Holdings Ltd., Sarah Enterprises International Ltd., Debtors.**

No. 04–35777 (CGM).

United States Bankruptcy Court, S.D. New York.

July 9, 2004.

Rachel L. Diehl, Joseph Lubertazzi, Jr., McCarter & English, LLP, Newark, NJ, Counsel for Hudson United Bank.

Andrew S. Wulfman, Cohen, Estis & Assocs., LLP, Goshen, NY, Counsel to the Debtors–in–Possession.

CECELIA MORRIS, Bankruptcy Judge.

Secured creditor Hudson United Bank ("*Hudson*") moved for relief from the automatic stay under Section 362(d)(1) and (2) in order to take possession of two vessels that serve as collateral for sums owing to Hudson: a yacht known as the *Dauntless* and a tug boat, *Robust* (ECF Docket Nos. 51, 91, 110 and 115; hereafter, the *"Lift–Stay Motion"*). After lengthy evidentiary hearings on May 18, 2004 and May 28, 2004, the Court determined that cause exists to lift the stay under section 362(d)(1), and an order lifting the automatic stay was entered on June 2, 2004 (ECF Docket No. 177).

As set forth below in greater detail, although the Debtors were using Hudson's collateral, the Debtors never indicated either a willingness or an ability to make adequate protection payments of principal or interest to Hudson. There was also testimony that the insurance was inadequate to cover the value, asserted by the Debtors, of the *Dauntless*, and that the *Dauntless* is at least in technical violation of federal law and could be subject to seizure. The *Dauntless's* precarious status in U.S. waters means that it cannot be chartered or sold in the United States. Moreover, cause exists because the Debtors have not been able to demonstrate an ability to reorganize. Although Debtors agree that the success of this reorganization depends on the ability to charter one or both of the vessels, and even after the Debtors had been in Chapter 11 for nearly 60 days the Debtors could not present the court with any documentation, independent testimony or evidence that would support a possible sale or charter of the vessels,

much less provide a detailed, consistent or realistic business plan.

### JURISDICTION

This Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. Motions to terminate, annul, or modify the automatic stay are "core proceedings" under 28 U.S.C. § 157(c)(2)(G).

### BACKGROUND FACTS

The following constitute the Court's findings of fact and conclusions of law under Bankruptcy Rules 9014 and 7052.

***Debtors' Businesses, Assets and Liabilities***

These cases are being jointly administered. In their petitions, as amended May 3, 2004, each of the Debtors list a mailing address in Newburgh, New York.

Balco Equities ("*Balco*") is a Delaware corporation with two principal assets: real estate located in New Windsor, N.Y. (the "*New Windsor Property*"), and all of the shares of Haddon Holdings Ltd. Nancy Cook is listed in the petition as president of each of the Debtors, and all of the shares of Balco are owned by an entity known as "The Cook Family Trust." The Debtors claim that the New Windsor Property has a value of $2 million, although it is the subject of a pre-petition contract of sale for $1.1 million to an entity known as Epic Orange, LLC ("*Epic Orange*"). Epic Orange has vigorously opposed the Debtors' stated intention to reject the contract and sell the New Windsor Property to a phantom higher bidder. Balco's Amended Schedule D shows that the New Windsor Property is encumbered by a single secured claim of $1.1 million jointly held by Hudson and an entity known as National Recovery Limited Partnership ("*NRLP*").

Haddon Holdings Ltd. ("*Haddon*"), a corporation formed in the British Virgin Islands, describes itself as being "in the business of refurbishing, converting and repairing commercial and private ocean-going boats." Haddon owns two major assets, the *Dauntless* and all of the stock of Sarah Enterprises International ("*Sarah*"). Sarah is also a British Virgin Islands corporation and is involved in the same business as Haddon. Sarah's sole asset is the *Robust.* Donald Boehm is shown as a director of both Haddon and Sarah and is the individual with the most knowledge as to the operations of all of the Debtors. Mr. Boehm claims more than 40 years' experience in the commercial ship and private motor yacht business. Nancy Cook testified at the Section 341 meeting of creditors that she has never made a decision with respect to Balco without input from Mr. Boehm. Transcript of Section 341 meeting, May 5, 2004 (hereafter "341 Tr."), 59–60.

At the time of these hearings, the *Robust* and *Dauntless* were docked in Tampa and Hollywood, Florida, respectively. The vessels are described in the Affidavit of Nancy Cook, submitted pursuant to Local Bankruptcy Rule 1007–2 (ECF Docket No. 12). The *Dauntless* was purchased in 1996 as a commercial survey vessel which has been "completely gutted and reoutfitted to a luxury yacht, taking two years to complete." Now "completely fitted for sail on the high seas," it was valued at $4.2 million in an April 2001 survey and "is presently listed for sale on the world market for $3.6 [m]illion (U.S.Currency) and is suitable for charter service on a contract basis at $35,000 per week." The *Robust* is a 178–foot commercial tug boat built for the British Royal Navy in 1974 for the purpose of tugging Britain's largest warships and for

ship salvage operations. It has a gross weight of 1,037 tons, accommodates a crew of 27, and can be used for long ocean towing. Mr. Boehm adds that the *Robust* "is one of the largest and most massively built tugs in the world, literally a 'Euclid' truck of tug boats." Affidavit of Donald Boehm, sworn to May 16, 2004 (ECF Docket No. 92; hereafter, *"Boehm Affidavit"* or *"Boehm Aff."*), ¶ 6. The *Robust* was purchased in 2001, and it was valued in an August 2001 survey at $1.3 to $1.6 million. Mr. Boehm testified that the Debtors have been marketing the *Robust* "from the day we bought it." Rule 2004 Deposition of Donald P. Boehm, May 13, 2004 and May 17, 2004 (ECF Docket Nos. 110 (Vol.2) & 115 (Vol.1); hereafter, "Boehm Deposition"), Vol. 2, page 65.

Each of the Debtors lists two secured creditors: Hudson, in the amount of $2,975,000, and NRLP, in the amount of $750,000. The Debtors have few general unsecured claims. Not counting multi-million-dollar claims of insiders such as Boehm and the Cook Family Trust, the Amended Schedules filed in Sarah and Balco reflect unsecured claims of less than $15,000 and $20,000 respectively. Haddon lists two significant creditors that may or may not be non-insiders: $1,266,080 owed to the Warmers Family Trust in New Windsor, New York, and $44,700 owed to James T. Wetzel of Newburgh, New York. However, the debt to Wetzel is designated in the schedules as "disputed." Thus, a successful Chapter 11 reorganization would principally benefit the Debtors' insiders.

### The Secured Debt to Hudson

Hudson holds a series of mortgages on the Debtors' assets, either on account of direct loans extended by Hudson to the Debtor or due to its status as the current holder of mortgages originally executed by the Debtors in favor of NRLP and Bombardier Capital, Inc. (*"Bombardier"*).

Hudson asserted in the Lift–Stay Motion that as of April 29, 2004 it was owed $2,960,371.76. Hudson's loans are secured by the assets of the Debtors (as set forth below), as well as a junior mortgage on Mr. Boehm's personal residence:

- *Balco:* Hudson's papers assert that the currently outstanding amount of its loan to Balco pursuant to the Forbearance Agreement (described below) is $729,993.97, and that default interest of 15% is accruing at a rate of $291.67 per day.

- *Haddon:* Hudson asserts that it holds two mortgages with current outstanding balances of $460,870.23 (a first mortgage originally given to Bombardier in February 2001 to secure a $1.8 million loan) and $480,586.83 (a second mortgage originally given to NRLP in March 2001). The first loan matured according to its terms in February 2003 and has not been paid. Bombardier commenced a foreclosure action against the *Dauntless* and Haddon in March 2003, and at some point while those proceedings were pending, the *Dauntless* was arrested. To protect its position as junior lienholder, Hudson purchased the Bombardier loan. Default interest of 15% is accruing on both loans at a rate of $159.85 and $181.99 per day respectively. Haddon executed a third mortgage to NRLP in November 2001 in connection with the loan to Sarah described below.

- *Sarah:* Hudson asserts that it holds a loan made by NRLP to Sarah in October 2001, the current total of which is $1,288,920.73. Interest is accruing at the default rate of 15%, or $447.75 per day. This loan matured according to its terms in October 2003 and has not been paid.

In December 2002 NRLP, on behalf of Hudson, issued a notice of default to the Debtors for failure to make payments and commenced a foreclosure action against the Debtors on or about April 27, 2003. In connection with that foreclosure action, Hudson obtained a warrant for the arrest of the *Dauntless* and secured the appointment of a custodian to execute the warrant. The *Dauntless* was arrested and taken into possession of the custodian. While controlled by the custodian, the *Dauntless* suffered physical damage and flooding, allegedly due to mishandling by the custodian. As a result of these and other developments, the Debtors and Hudson eventually reached agreement providing for dismissal of the foreclosure action and return of the *Dauntless* to the Debtors' control pursuant to a forbearance agreement dated September 15, 2003 (ECF Docket No. 51, Ex. N; hereafter, the *"Forbearance Agreement"*).

The Forbearance Agreement was for the purpose of granting the Debtors an opportunity to sell the *Dauntless* and *Robust* and repay the debt to Hudson in full. Boehm Deposition, Vol. 2, page 67. In connection with the Forbearance Agree-ment, Haddon and Sarah received money needed to pay expenses associated with the maintenance and upkeep of the *Dauntless* and *Robust* pending a sale of each. Hudson advanced $700,000 in consideration for, among other things, a $1.1 million mortgage on the New Windsor Property and guarantees by each of the Debtors for all of the outstanding obligations to Hudson. The Forbearance Agreement states at Sections 6.12.1.2 and 6.12.1.3 that: "In order to induce [Hudson] to enter into this Agreement, [Debtors] have represented to [Hudson] that they will aggressively market" both the *Dauntless* and *Robust* during the forbearance period, which would expire on March 31, 2004. The Forbearance Agreement also contained a schedule dividing the forbearance period into three stages; at the conclusion of each stage, the Debtors agreed to a "stepdown" in the maximum price for which each ship could be listed for sale. The "stepdown" in prices and the schedule set forth below was agreed between the parties to be "commercially reasonable and in the best interests of the [Debtors]". (Forbearance Agreement, §§ 6.12.1.3, 6.12.2.2).

| Vessel | 9/15/03 to 12/31/03 | 1/1/04 to 2/28/04 | 3/1/04 to 3/31/04 |
|---|---|---|---|
| *Dauntless* | Not to exceed $3,250,000 | Not to exceed $2,950,000 | Not to exceed $2,700,000 |
| *Robust* | Not to exceed $1,200,000 | Not to exceed $900,000 | Not to exceed $800,000 |

Mr. Boehm testified at the May 28, 2004 evidentiary hearing and in his deposition that the Debtors did not adhere to this schedule and continued to list the *Dauntless* at $3.25 million and the *Robust* at $1.2 million for the entire period. *See* Boehm Deposition, Vol. 2, pages 68–70, 106. Mr. Boehm claims the Debtors would have accepted an offer for either vessel at or below the stepdown price. No written offers at any price were received for either the *Dauntless* or the *Robust* during the forbearance period.

### Post–Petition Activity

The Debtors' cases were filed on March 30, 2004, the day before the Forbearance Agreement expired. A brief recitation of the proceedings leading up to the Lift–Stay Motion is helpful in understanding the Court's findings that Hudson is not

adequately protected and that the Debtor has no reorganization in prospect.

The Debtors sought financing in the amount of $250,000 from an entity known as "Total Leasing" which would be secured by, among other things, first-priority and/or junior liens in all of the Debtors' assets, and a superpriority administrative claim in accordance with § 364(c)(1) (ECF Docket No. 29; hereafter, the *"Financing Motion"*). The Debtors sought approval of the Financing Motion in order to meet all of their monthly expenses. According to the Financing Motion, the Debtors were not able to obtain credit on an unsecured basis, and therefore could only fund ongoing expenses by granting additional liens against estate property. The Financing Motion revealed that the Debtors had no cash flow and would incur expenses of at least $50,000 per month while in bankruptcy. Although the budget was to undergo several revisions, approximately half of the amount sought in the Financing Motion was intended to cover costs between March 31, 2004 and May 24, 2004, with an additional $58,274 to be used for the period between May 24, 2004 to July 30, 2004, and $55,274 from July 1 to July 28, 2004. Significantly absent from the Financing Motion's budget was any provision for adequate protection payments of interest or principal to Hudson.[1] Notwithstanding these high monthly costs, Debtors did not apply for authorization to retain a broker for sale or charter of the vessels until May 18, 2004. (ECF Docket No. 95)

The Financing Motion was not filed with the other first day orders but as an "emergency motion" on April 13, 2004, with a hearing date of April 15, 2004, one day prior to the date that the crews of the *Dauntless* and *Robust* were due to be paid. Under the circumstances, the Court authorized interim financing of only $25,000, to be treated as a superpriority claim. (ECF Docket No. 36) This amount was necessary to meet the biweekly payroll and pay an insurance premium. An additional $7,700 was authorized on April 29, 2004, again on an interim, unsecured basis, to cover further payroll obligations. (ECF Docket No. 75) Because the Court was concerned that parties had not received notice of the April 29, 2004 hearing seeking approval of an amended financing agreement and budget that had not been filed electronically, the Financing Motion was again adjourned. Prior to any further hearing on the Financing Motion, Hudson and Epic Orange filed objections. (ECF Docket Nos. 82, 83 and 112) During this same period, Hudson filed the Lift–Stay Motion and obtained an order pursuant to Bankruptcy Rule 2004 directing an examination of the Debtors through their principal, Mr. Boehm, and for the production of documents. (ECF Docket No. 52) The Financing Motion was never granted, and the hearing on May 13, 2004 concluded with Hudson's agreement to advance $13,700 in order to cover the current payroll.

In addition to difficulty meeting filing and administrative requirements, other problems emerged. The Rule 2004 deposition was rescheduled twice due to Mr. Boehm's failure to appear. Boehm was ultimately ordered from the bench to appear and be deposed. Boehm also failed

---

1. The Debtors made only one allusion to the possibility that Hudson could be repaid prior to confirmation. Debtors state that they expect to receive $300,000 to $500,000 from sale of the New Windsor Property which, taken together with net funds of $150,000 from charter of the vessels would "reduce the obligations owed to secured creditors by between $1.7 and $1.8 Million by the time the Debtors' plan is confirmed." Debtors' Memorandum of Law in Opposition to the Lift–Stay Motion, p. 16–17. No testimony was ever provided to clarify this incomprehensible and mathematically impossible assertion.

to appear at the Section 341 meeting in spite of the United States Trustee's specific request that he be present for examination. Some documents requested by Hudson pursuant to the Rule 2004 order were not provided until after May 24, 2004, which prejudiced Hudson in its ability to prosecute the Lift–Stay Motion because it could not prove its case under Section 362(d)(2).[2] Other documents requested in the Rule 2004 order and not provided were disclosed for the first time as exhibits to the Debtors' May 18 application to retain real estate brokers.

### The Lift–Stay Motion

In the Lift–Stay Motion, Hudson asserts that the following facts justify relief:

- Hudson is not receiving payments of principal or interest post-petition and has received no payments since October 2002.

- Expenses of more than $50,000 per month are accumulating post-petition, and Debtors do not propose to pay the $22,000 in interest accruing monthly on the principal amounts owed to Hudson. There is currently no source of revenue existing to pay any of these post-petition obligations.

- The Debtors have been trying to sell the ships for a significant period of time, with no result. To date, the Debtors have not produced any concrete evidence that the value of the ships exceed the liens. There are no signed contracts of sale or current appraisals from an expert competent to testify to their value. The Debtors' inability to sell the ships during the forbearance period at a combined price of $3.5 million proves that the Debtors have no equity in the collateral.

- Hudson has financed the Debtors' unsuccessful attempts to sell the vessels since April 2003 because it has been forced to advance additional funds to ensure their upkeep. In addition to the $700,000 loan made in connection with the Forbearance Agreement, Hudson has advanced an additional $470,000 pre-petition in order to maintain the vessels, and $13,800 post-petition.

- Debtors have no intention of reorganizing, and they seek merely to liquidate at the expense of creditors, in bad faith.

Thus, Hudson originally argued that "cause" existed to lift the automatic stay under Section 362(d)(1), and that the stay should be lifted under Section 362(d)(2) due to a lack of equity in the collateral and the fact that the ships are not necessary for an effective reorganization which is in prospect. After May 18, 2004, Hudson proceeded only under Section 362(d)(1) because the Debtors had not provided sufficient court-ordered information to allow Hudson to make its case under Section 362(d)(2).

### The Debtors' Opposition

In opposition to the Lift–Stay Motion (ECF Docket Nos. 92 and 93), the Debtors contend that Hudson is over-collateralized because (1) the *Robust* is worth between $1.7 and $1.9 million dollars, (2) "the most recent survey report" of the *Dauntless*, prepared in 2001, values it at $4.2 million, and (3) Hudson also has (i) a $1.1 million mortgage against the New Windsor Property, (ii) a mortgage on Mr. Boehm's personal residence, and (iii) security interests

---

2. Many of the documents that were not provided, or at a minimum not timely provided, pertained to the Debtors' efforts to market the vessels, evidence of communications between the Debtors and third parties regarding sale of vessels, and contracts of sale or bills of sale related to the vessels including the original bill of sale, brokers agreements and publicity.

in lawsuits in which the Debtors have a potential recovery of $575,000.

The Debtors also argue that the *Robust* and *Dauntless* are necessary to the Debtors' reorganization because these vessels will be chartered in order to generate revenues that will fund the Debtors' operations. The Debtors anticipate generating "approximately $250,000 to $300,000" in revenues from chartering the *Dauntless* "over the next six to 12 months," which would admittedly constitute cash collateral belonging to Hudson. The Debtors also note that the *Robust* cannot be chartered until certain repairs are made, and that those repairs will require a substantial additional investment. The Debtors state that "significant interest" has been shown in the *Robust* from unidentified "interests out of Brazil," but because the buyer does not intend to purchase the vessel for its highest and best use, "there is a significant question as to the price these interests are willing to pay for her." Boehm Aff. ¶ 32. This statement is at odds with Nancy Cook's prior testimony that she was unaware of any offers for the Robust. 341 Tr. At 117. The Debtors estimate that sale of the *Robust* would reduce monthly operating costs from $40,000 to $25,000.

The Debtors state their intention to generate additional funds by rejecting the contract with Epic Orange for sale of the New Windsor Property in favor of a higher offer with fewer contingencies. The Debtors claim that since the petition date, four different developers "expressed serious interest" in the New Windsor Property and "[m]ost recently, the Debtor has received an initial contract offer to purchase the subject real estate for cash at closing of $1.6 million, without contingencies with a proposed closing date within 90 days." Boehm Aff. at ¶ 46. In her testimony at the Section 341 meeting of creditors, Nancy Cook indicated that although Mr.

Boehm indicated that other parties were interested in purchasing the property, she was not personally aware of them. 341 Tr., pages 52–54. In the event that the *Robust* could not be sold, the Debtors planned to use proceeds from sale of the New Windsor Property to outfit it for commercial charter to generate additional revenues. Finally, Debtors expected to file a confirmable plan by June 30, 2004 and seek a confirmation hearing by the end of July 2004.

The Lift–Stay Motion was scheduled for an evidentiary hearing on May 18, 2004.

### The May 18 Evidentiary Hearing

As Hudson eventually proceeded only under Section 362(d)(1), much of the testimony of its witness from Ardell Yacht and Ship Brokers, Jeremy Mold, is irrelevant because it was directed to his opinion of the value of the *Dauntless*. In any event, Mr. Mold's testimony was largely unpersuasive. He was previously employed as a broker on behalf of the Debtors, which dismissed him from that capacity. Moreover, his valuation of the *Dauntless* was limited to review of the price at which comparable boats were offered for sale, not their actual sales price. Mr. Mold did testify to the fact that the *Dauntless* had been exhibited at several boat shows, including the Ft. Lauderdale International Boat Show, but no offers were received at the $3.25 million listed price.

### The May 24 Hearing

On May 24, 2004 the parties were not prepared to resume the evidentiary hearing. Mr. Boehm had only recently been deposed, and the transcripts would not be available until May 27, 2004. Additional time was also needed because the Debtors had not produced certain documents requested by Hudson. The Court also determined that an adjournment to May 28, 2004 was advisable in order to give the Debtors a further opportunity to prove

that a business plan, idea, theme, something was in prospect. Because the Debtors' opposition had so far consisted primarily of unsubstantiated claims that a sale or charter was forthcoming, the Court stated unambiguously that for the purposes of the Lift–Stay Motion she would not accept testimony from Mr. Boehm as to pending charters or sales if that testimony was in the form of speculation or wishful thinking and warned that it would insist on concrete evidence of an imminent business prospect, such as a contract or sworn testimony from a third party willing to enter into a contract.

The Court was informed that the *Dauntless* was currently without a valid cruising permit and therefore in violation of federal law and subject to seizure pursuant to 19 C.F.R. § 4.94. Accordingly, the Court *sua sponte* ordered that the *Dauntless* not be moved from its dock pending resolution of the Lift–Stay Motion. (ECF Docket No. 114) The Debtors protested that this would inhibit the ability to charter the *Dauntless*, but the Debtors had no independent evidence of any kind to show that there was current interest in chartering the vessel, and to do so during the four-day period between May 24 and the hearing on May 28 would require moving the boat out of U.S. territory.

### The May 28 Evidentiary Hearing

At the outset, Hudson indicated that its evidence would demonstrate entitlement to relief under Section 362(d)(1), "for cause," for four reasons: (1) Hudson is not adequately protected, (2) Debtors have no business prospect for reorganization, (3) Debtors have acted in bad faith, both prepetition and post-petition, and (4) Debtors have mismanaged the collateral.

Upon inquiry from the Court, it was evident that there was still absolutely no independent evidence from the Debtors as to any potential charter or sale of the vessels, or for sale of the New Windsor Property. Debtors asserted that charters had been obtained for both of the vessels, but subsequent documents and testimony revealed that this was untrue. The so-called charter for the *Robust* was an e-mail inquiry to a third party regarding the possibility of chartering a vessel; there was no written charter for the *Dauntless* either, only an expression of interest that Mr. Boehm intended to pursue by meeting with the interested party in person in the Bahamas. It was also revealed that the "initial contract offer" to purchase the New Windsor Property "for cash at closing of $1.6 million, without contingencies with a proposed closing date within 90 days" referred to in the Boehm Affidavit was merely an option contract, unsigned, and containing many contingencies, including a contingency that the buyer's proposed development project be approved by the town of New Windsor and could be supported by the existing water system.

The parties agreed to stipulate to numerous facts in order to facilitate the balance of the evidentiary hearing.[3] Many of the stipulations refer to Mr. Boehm's testimony during his Rule 2004 Deposition.

---

3. Emblematic of this entire hearing is the conversation set forth below, resolving an objection by counsel to the Debtors, Andrew Wulfman, to the recitation by Hudson's counsel, Rachel Diehl, of the parties' stipulations, which they had agreed to moments before placing them on the record:

> Ms. Diehl: Mr. Boehm stipulated that he did sign two contracts to purchase the *Robust*. Mr. Boehm stipulated that one con-

tract was for $1 million, of which he signed. Mr. Boehm stipulated that one contract for the *Robust* was for $300,000 of which he signed.

> The Court: Excuse me, just to be clear on this one, if you would please for me, these are when he purchased . . .
> Ms. Diehl: The *Robust* originally . . .
> The Court: This is when he purchased the *Robust*, there was one contract for $1

Several key facts were agreed to, including the following:

- The Debtors have been in default in their obligations to Hudson since February 2003. As of May 24, 2004, the Debtors' total indebtedness to Hudson was at least $3.2 million.
- There is no line item in the Financing Motion budget providing for payment of any amount to Hudson.
- Balco does not, and never has, generated any operating income. Since filing petition, no gross revenues have been generated by any of the Debtors. Haddon has generated income on only two occasions. The first was the sale

of a refurbished vessel known as the *Lady Victoria*. The *Dauntless* was leased for one day and used by a film crew as a movie set.

- The Debtors have a case pending in Florida state court against International Ship Repair & Marine Services, Inc. that is potentially worth $575,000. Although the Debtors have counsel in that litigation, Debtors have not made the required application to this Court for retention of the firm as an estate professional.
- Mr. Boehm has not used either vessel for personal reasons, and his only visits were for business purposes.

million and there was one for $300,000, and he signed both of them?

Ms. Diehl: Correct.

Mr. Wulfman: That's not his stipulation and that's not his testimony. That's not his stipulation and that's not his testimony. He did sign two contracts. He did sign two contracts. He testified that . . .

The Court: I'm not letting you testify. You've either stipulated to that or you haven't. If you haven't stipulated, we're going to go to the . . .

Mr. Wulfman: He said he signed two contracts. That's what we're stipulating to. That's it. He signed two contracts.

Ms. Diehl: I asked Mr. Boehm personally: Did you sign two contracts? Was one of the contracts for $1million? Was one for $300,000. He said yes.

Mr. Wulfman: That's correct. That's as far as he goes.

The Court: But that's what was just said.

Mr. Wulfman: Then we're fine.

The Court: And my question simply was, let's be clear on this, and my question simply was, was when he purchased the *Robust*, he signed two contracts, one for $300,000 and one for $1 million?

Mr. Wulfman: That's not accurate.

The Court: Okay, what is accurate?

Mr. Wulfman: Mr. Boehm . . .

The Court: No, tell me what's not accurate. What are we stipulating to? You stipulated that—we're talking about the purchase of the *Robust*—we're talking about two contracts that were signed. One was for $300,00, one was for . . .

Mr. Wulfman: There is extensive testimony as to what transpired, Mr. Boehm said he signed the contract. There was a convoluted structure here, but that he signed a million dollar contract, and it was requested that he sign a $300,000 contract for the purposes of the ultimate . . .

The Court: If there are no papers on it then it's not going to come into evidence, as I've ruled already. So what are we stipulating to, and is this in controversy, and are we going to have testimony on it?

Mr. Wulfman: I feel that what she is stipulating to is accurate. Your Honor is looking for more. If Your Honor is looking for more, that has to be testified. If that has to be testified to, that's the case.

The Court: I simply repeated what I thought she said. Let me repeat again what I thought I heard was the stipulation: When Mr. Boehm purchased the Robust he signed two contracts, one for $300,000, one for a million. And you're shaking your head no . . .

Mr. Wulfman: That's not accurate. He says he signed two contracts in connection with the purchase of it, not at the time. The purchase was consummated at a later date. The two contracts were not contemporaneous, as my understanding, and they were [inaudible].

The Court: You're splitting hairs on me.

Mr. Wulfman: I don't mean to.

The Court: But you are. We're not stipulating to that one because I don't understand it.

- The success of the Debtors' reorganization is dependent upon the ability to charter one or both of the vessels.

### The Dauntless

- The *Dauntless* has never been chartered in open waters. There is currently no written agreement for either the charter or sale of the *Dauntless*. If the *Dauntless* were chartered, such use would subject it to normal wear and tear.

- *Dauntless* is a foreign-flagged vessel and cannot be chartered in U.S. waters or sold to an American citizen in U.S. waters. Thus, in order to charter the *Dauntless* it would have to be taken offshore and chartered from a foreign port.

- As of May 17, 2004 Mr. Boehm did not know which foreign port would be utilized for chartering the *Dauntless*. The closest ports are located in the Caribbean, but according to Mr. Boehm's testimony it is currently regarded as the off season for chartering activity in that area due to the hot summer weather. The nearest center for current charter activity is in the northeastern United States, near Newport, Rhode Island, a port not available for charter or sale to a non-U.S.-flagged ship.

- In order to operate the *Dauntless* in U.S. waters, a valid cruising permit is necessary. The *Dauntless* currently does not have a valid cruising permit and is in "technical violation" of U.S. law. Without a cruising permit, the *Dauntless* could not enter any port designated as a "high security port," including New York, Boston, Philadelphia and Baltimore.

- Although Haddon's schedules listed the *Dauntless* as having a fair market value of $4.2 million, the *Dauntless* had been offered at $3.25 million. The *Dauntless* was purchased in 1996 for $475,000.

- The *Dauntless* is currently insured for $2.5 million. The policy was scheduled to expire on June 15, 2004 and would cost $40,000 to renew, an expense which was not provided for in the budget that accompanied the Financing Motion.

### The Robust

- The *Robust* has never been chartered, is not ready to be chartered, and no written charter agreements for the *Robust* exist. Additional repairs are required, including painting, installation of communication equipment, and installation of safety gear.

- Although Sarah's schedules listed the *Robust* as having a fair market value of $1.6 million, the *Robust* had been offered through December 31, 2003 at a price of $1.2 million. No written offers have been received for the *Robust*. The Robust is currently insured for $1.2 million.

- Boehm testified in his 2004 Examination that he purchased the *Robust* for $1 million and spent more than $850,000 to repair and refurbish the vessel. As of May 16, 2004 additional repairs were required.

- There are unpaid radio license and documentary permits required for the *Robust* which will cost $10,500. This amount was not provided for in the budget accompanying the Financing Motion.

Hudson offered the testimony of one of its senior vice presidents, Terrance J. Edwards. Mr. Edwards testified that Hudson has not received any payments from the Debtors on account of this indebtedness since October 2002 except for the application of money held in an interest reserve account, which were applied to pay

part of the interest due on each loan through November 30, 2002. Edwards further testified that Hudson now calculates its total claim to be in excess of $3,485,717.88, and that interest is accruing on this amount at $1,277.61 per day. This principal amount includes additional expenditures required to maintain the *Dauntless* and *Robust*: $395,477.38 for the period between April 18, 2003 and September 22, 2003, and $79,000 for additional expenses between March 10, 2004 and March 31, 2004. The amount does not include attorneys' fees or $13,800 advanced post-petition for employee wages and docking fees. On cross-examination, Mr. Edwards admitted that he had no reason to believe that the vessels are declining in value.

Based upon the foregoing stipulations, pleadings and testimony of Mr. Edwards, the Court indicated that Hudson had made a *prima facie* showing of cause to lift the automatic stay.

The Debtors made the following proffer intended to rebut Hudson's *prima facie* case:

- The Debtors could potentially charter the *Dauntless* and *Robust* in northern waters, operating out of Nova Scotia, during the current off-season in the Caribbean.
- Ongoing operating costs and a plan of reorganization could be funded by chartering both vessels. The Debtors offered proof of this in the form of a narrative by Mr. Boehm as to his discussions with third parties, and other "potential revenue."
- Debtors also intended to fund operations by rejecting the contract with Epic Orange and selling the New

Windsor Property at a significantly higher price. Debtors' counsel stated that a motion to reject the Epic Orange contract had been filed earlier that morning.[4] Evidence of sale at a higher price was to be provided, again by testimony of Mr. Boehm as to his communications with real estate brokers.

- Evidence of other funding was offered in the form of testimony from Mr. Boehm, including the "possibility" of obtaining financing that would "take out" Hudson's position, as well as "other projects" Mr. Boehm was currently contemplating.
- The Debtors had the ability to secure financing from Total Leasing for repairs to the *Robust* so that it could be chartered, and the parties had agreed to a term sheet setting forth the details of the proposed financing.
- Hudson is not entitled to payment of interest because it cannot prove that it is oversecured. Unless Hudson is oversecured, under 11 U.S.C. § 506, Debtors are not required to pay interest to Hudson on its secured claim. Moreover, Debtors contended that Hudson's agreement in the Forbearance Agreement to waive payments of principal and interest during the forbearance period continued to bind Hudson for the duration of the Chapter 11 case.
- Regarding Hudson's contentions of pre-petition bad faith, the Debtors respond that Second Circuit law requires a showing of subjective bad faith, and that these cases were filed with the good-faith intention to seek Chapter 11 for a proper purpose. As for the allegations of post-petition bad-faith

4. A law clerk search of ECF in the courtroom revealed no such filing. In fact, it was not filed until July 1, 2004.

conduct, the Debtors assert that their conduct has been no worse than in every other Chapter 11 case.

- As for the allegations that the Debtors have mismanaged their collateral, the Debtors reply that they have managed and conducted their businesses since inception in a competent manner and offer as proof the refurbishment and sale of the *Lady Victoria,* which resulted in a substantial reduction in the balance of outstanding debt owed to Hudson.

The Debtors also presented evidence from Stephen Klaity, an accredited marine surveyor licensed in Florida. Mr. Klaity conducted a survey of the *Dauntless* in April 2001 and valued it at $4.2 million. Mr. Klaity walked through the *Dauntless* one day prior to his testimony. He found its current condition to be "seaworthy" and "pristine" and believed its fair market value would exceed $4 million. Asked about the insurance levels, Mr. Klaity testified that in his experience it was standard for ships such as the *Dauntless* to carry lower levels of coverage while in port, and that the coverage increases when out at sea. Mr. Klaity also testified that as much as $345,000 per year could be obtained from chartering the *Dauntless,* based on Charter rates of $28,000 in northern waters and $38,000 per week in the Caribbean (net of expenses). Debtors' counsel attempted to lead Mr. Klaity to testify as to the Debtors' ability to charter the *Dauntless,* even after Klaity indicated that this subject was beyond his expertise.

Mr. Boehm also testified on behalf of the Debtors. Debtors' counsel again attempted to lead Mr. Boehm's testimony on various issues, especially the feasibility of chartering the vessels. As for prospects of reorganization, Mr. Boehm could identify no documentary evidence beyond the unsigned option contract for the New Windsor Property. He testified that interest in a "one-way" charter had been expressed but would have to be negotiated offshore. Mr. Boehm further testified that he had recently been approached by two large charter companies, and Mr. Boehm projected that annual income of $420,000 could be generated by chartering the *Dauntless.* No documentary evidence was offered to support this hearsay testimony. Mr. Boehm also testified that it was his intention that the *Robust* be sent "out to work" under a charter, but the only evidence of potential interest was an inadmissible, vague e-mail inquiry sent to a naval architect in Canada. Finally, Mr. Boehm controverted the earlier testimony of Nancy Cook at the Section 341 Meeting of creditors that money invested in renovating the *Dauntless* totaled at least $6.5 million; he put the figure at no more than $3.8 million in "direct costs," but conceded that this did not include the cost of maintenance or insurance.

### DISCUSSION

■ Section 362(d)(1) of the Bankruptcy Code provides that:

(d) On request of a party in interest and after a hearing, the court shall grant relief from the stay ... (1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]

"The term 'cause' is not defined in the Bankruptcy Code, and whether cause exists should be determined on a case by case basis." *Manhattan King David Rest. Inc. v. Levine,* 163 B.R. 36, 40–40 (S.D.N.Y.1993) (citing *In re Sonnax Indus.,* 907 F.2d 1280, 1286 (2d Cir.1990)). "Cause, for either dismissal [under 11 U.S.C. § 1112(b) ] or relief from the stay [under 11 U.S.C. § 362(d)(1) ], may be found based on unenumerated factors, including 'bad faith,' or failure to deal with

creditors fairly even where 'bad faith' is not found." *In re AMC Realty Corp.*, 270 B.R. 132, 140 (Bankr.S.D.N.Y.2001) (citations omitted).

■ The moving party has the burden to make a *prima facie* showing that "cause" exists for relief from the stay. *See In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir.1990). "The burden of proof on a motion, like this one, to lift the automatic stay is a shifting one; section 362(d)(1) requires an initial showing of cause by the movant, while section 362(g) places the burden of proof on the debtor for all issues other than the debtor's equity in property." *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 321–322 (Bankr. S.D.N.Y.2001) ("cause" existed under Section 362(d)(1) where "no adequate protection payments whatever have been made or proffered").

■ "A continued failure to make monthly payments under loan documents can constitute cause for granting relief from the automatic stay.... Typically, however, cause will only be found where the failure to make monthly payments corresponds with a nonexistent equity cushion." *In re James River Assocs.*, 148 B.R. 790 (E.D.Va.1992) (citations omitted) (affirming bankruptcy court's decision to lift the stay where "there was both a small or nonexistent equity cushion and a failure to make monthly payments for approximately 17 months (7 months since filing the bankruptcy petition)"). Even when a slight equity cushion exists, this does not constitute adequate protection where post-petition interest is accruing, and the debtor is not able to pay expenses as they come due. *See, e.g., In re Fortune Smooth (U.S.) Ltd.*, 1993 WL 261478 at *6 (Bankr. S.D.N.Y. July 6, 1993) (lifting the stay "for cause," notwithstanding an equity cushion of 14.89%, *i.e.*, the collateral was valued at

$3.63 million and was encumbered by liens totaling $3.095 million).

### Lack of Adequate Protection

Lack of adequate protection is specifically mentioned as a ground for which the stay may be lifted "for cause" under Section 362(d)(1). Section 361 of the Bankruptcy Code provides in relevant part that:

When adequate protection is required under section 362 ... of this title of an interest of an entity in property, such *adequate protection may be provided by—*

(1) *requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;*

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

■ The Debtors have never indicated either a willingness or an ability to make any adequate protection payments to Hudson, although the Debtors' only hope of reorganization was to use Hudson's collateral. Post-petition interest is accruing to Hudson at an alarming rate, and the Debtors have failed to demonstrate an ability to pay monthly expenses directly related to

the maintenance of Hudson's collateral without borrowing money on a secured, super-priority basis. The undisputed testimony was that Hudson has had to pay for the maintenance of the collateral, both pre-petition and post-petition.

■ The Debtors' assertion that adequate protection payments need not be made because Hudson cannot prove that it is oversecured is disingenuous at best. It has been the Debtors' position throughout the course of this entire case that Hudson is "so over collateralized that it has virtually no motivation to take the steps necessary to maximize the value of the Debtors' assets." Debtors' Memorandum of Law in Opposition to the Lift–Stay Motion, p. 8. Furthermore, Hudson has been unable to show that it is oversecured due to the Debtors' failure to timely produce documents necessary to its case. For the purposes of this decision it is assumed that there is a slight equity cushion, and that Hudson is entitled to adequate protection payments; to assume otherwise would automatically entitle Hudson to relief from the stay under Section 362(d)(1). The Court likewise rejects Debtors' argument—raised for the first time during the course of the May 28, 2004 hearing—that Hudson should not be entitled to post-petition payments of either principal or interest because the case was filed the day before the expiration of the Forbearance Agreement that waived payment of principal or interest through March 31, 2004. Hudson was never notified of this argument, and the issue was never briefed. Debtors never listed the Forbearance Agreement as an executory contract in any of their Schedules and have not sought to assume it. Even if the Debtor could have assumed the Forbearance Agreement, it is well settled that "events after the filing of the bankruptcy petition may cause the contract to be regarded as not executory when the motion to assume or reject was made, such as contracts which expired post-petition by their own terms after the date of the petition but before the motion was heard." *In re Child World, Inc.*, 147 B.R. 847, 852 (Bankr.S.D.N.Y.1992). There can be no dispute that the Forbearance Agreement expired by its own terms on March 31, 2004. "Once the contract is no longer in existence, the right to assume it is extinguished. A contract may not be assumed under § 365 if it has already expired according to its terms." *Counties Contracting and Const. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1061 (3d Cir.1988) (citing *Collier on Bankruptcy*). *See also In re Texscan Corp.*, 107 B.R. 227, 230 (9th Cir. BAP 1989) ("It is axiomatic that before 11 U.S.C. § 365 can apply a contract must exist. If a contract has expired by its own terms then there is nothing left to assume or reject.").

The Debtors candidly admit that sale of either vessels will be a time-consuming process completely dependent upon locating "prospective buyers who have a specific object in mind, whether it is filling a need for a commercial vessel, or purchasing a private yacht that suits their personal tastes." Boehm Aff., ¶ 39.

> [T]he market for this class of vessel is such that the pool of available buyers in the market fluctuates in correlation with economy. Thus, if the economy is improving, the pool of available buyers for yachts in all classes tends to improve. However, in periods of recession, the pool of available buyers for such vessels shrinks dramatically and, usually, the only active participants in the market are speculators who aim to purchase vessels at "cents" on the dollar.

*Id.* at ¶ 38. Even if the Debtor could charter the *Dauntless* until it could be sold, the proceeds would not cover all ex-

penses, even if a constant stream of charter clients could be assured.

> [T]he secured creditor lacks adequate protection if the value of its collateral is declining as a result of the stay. It must, therefore, prove this decline in value—or the threat of a decline—in order to establish a prima facie case. Once the movant satisfies this initial burden, the burden shifts to the debtor to go forward with evidence, and ultimately, to prove that the collateral is not declining in value, or that the secured party is adequately protected through periodic payments, an equity cushion, additional or replacement liens or good prospects for a successful reorganization.

*In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr.S.D.N.Y.1994) (citations omitted).

█ Although there is no evidence in this case that the vessels are currently declining in value, the Debtors concede that the proposed charter business would result in wear and tear to the vessels.[5] Thus, even if the Debtors' reorganization proceeds favorably (*i.e.*, the Debtors are able to charter the vessels until they can be sold), this would result in an erosion in the condition of Hudson's collateral, and Hudson would still not receive adequate protection payments. In any event, decline in value of collateral is not the only means by which a secured creditor may lack adequate protection. Where the collateral is in use, the secured creditor is paying to maintain the collateral, and the debtor has been unable to sell the collateral or generate income to make adequate protection payments, the effect from the creditor's viewpoint is identical. A secured creditor can sometimes prove its *prima facie* case "without quantifying the decline in value ... by demonstrating that the debtor has completely failed, or substantially failed, to make post-petition payments." *Id.* at 903 (citing cases). "This approach does not quantify the decline in value, and the force of the proof depends on the strength of the inference that the value of the debtor's property declines over time. This approach may have appeal if the debtor uses the secured creditor's property during the case, but makes no post-petition payments." *Id.*

In this case, there are many other hallmarks of a lack of adequate protection. In addition to the Debtors' inability to make adequate protection payments even under their most hopeful reorganization scenario, there is no ready market for the purchase of the vessels, and the size of the equity cushion is uncertain. The Debtors have no means of paying for the constant maintenance required to sustain seagoing vessels, including provision of a crew and the supplies necessary for their sustenance; thus it is likely that Hudson will be required to make advances in the future in order to preserve its collateral. Moreover, the *Dauntless* does not have a valid cruising permit, and its insurance levels while in port are insufficient to cover the value

---

**5.** From the Boehm Deposition:

Q: Is it a true statement that to the extent the Dauntless is chartered, that it would be subject to wear and tear if it's chartered?

A: Sure. No matter how careful you are, you are putting people on boats that are not used to boats. Soiling is different. You have a boat that you don't get on the boat with shoes on, and now you will have people that will try to get away—I mean, there are baskets where everybody puts their shoes. You always board a boat with stocking feet and a clean pair of shoes that are in the basket for you to put on. Then you have the drink problem, spilling of the drinks and that sort of stuff. What can I say, it's a hotel business.

Vol. 2, pages 82–84.

asserted by the Debtors, much less while at sea.

### No Reorganization in Prospect

In view of its finding that Hudson is not adequately protected, the Court was constrained to lift the stay unless the Debtors could present some evidence that a successful reorganization was underway that would enable the Debtors to provide adequate protection.

■■■ The Debtors' proffer at the May 28 hearing was supported by virtually no independent evidence. Directly contrary to the Court's warning on May 24, the proffer relied heavily upon testimony of "potential revenue," the "possibility" of charter income, hearsay conversations with brokers as to interested buyers, and the prospect that financing could be obtained. It was not asserted that any deal was in place, and no independent party was identified to the Court as having an interest in purchasing any assets, chartering either vessel or providing "take-out" financing to the Debtors. Prior to May 28, 2004 the Debtors had never referred to the possibility of chartering in northern waters, and no competent evidence was submitted as to whether this was a feasible option.[6] As on prior occasions, the vast majority of Mr. Boehm's testimony was founded almost entirely upon speculation and conjecture.

Under the circumstances of this case, Debtors' failure to present any evidence of an organization in prospect constitutes additional cause to lift the stay. *Cf. In re New Era Co.*, 125 B.R. 725, 730 (S.D.N.Y. 1991) (affirming relief from stay under Section 362(d)(2) where no reorganization was in prospect; all the court had before it were "pipe dreams" of an interested party

unsupported by any non-party evidence. "Unrealistic hypotheticals such as these are the precise reason why the statute requires that the property be necessary to an effective reorganization."). There is no reorganization in prospect. Debtors' reorganization goals vacillate between a so-far equally fruitless hope to sell the vessels and a hope to charter them, and at the literal last hour, with strong objection, the Debtors hinted at an "equity infusion." The desire to commence a new and unfamiliar business venture by chartering the vessels is nothing more than an elusive stop-gap measure. There is no core of business or experience from which the Debtors are reasonably likely to draw charter income. Moreover, the *Robust* cannot be chartered until substantial repairs are made.

The facts in this case are similar to *In re Powers Aero Marine Servs., Inc.*, 42 B.R. 540 (Bankr.S.D.Tex.1984), in which the secured creditor obtained relief from the stay against a yacht owned by the debtor for cause and lack of adequate protection under Section 362(d)(1). The Court lifted the stay notwithstanding the fact that the debtor had significant equity in the yacht.

> The yacht, according to testimony, requires a crew of several persons that must be paid, fed and quartered. The yacht itself, as is the case with all yachts, requires frequent provisioning with supplies as well as constant maintenance. There are substantial fixed expenses demanding heavy expenditures of funds. It is conceivable that until the debtor is able to present the yacht in a workable condition, ready for charter, many additional funds will have to be

---

**6.** Even the reference to the motion to reject the contract with Epic Orange could not be verified. Epic Orange eventually obtained an order requiring the Debtors to file a motion to reject the Epic Orange contract before June

30, 2004 and providing that the contract would otherwise be deemed assumed. (ECF Docket No. 140) The Debtors did not file a motion to reject the Epic Orange contract prior to June 30, 2004.

expended, further diminishing an almost non-existent liquid estate.

*Id.* at 545. The lack of liquid assets and the "debtor's inability to procure any firm offers for chartering" rendered it "impossible to structure an order fashioning some form of adequate protection in face of the large monthly payments necessary to meet the secured indebtedness." *Id.* at 545–547.

The Court's insistence on some evidence of a reorganization in prospect at an early stage in the case is warranted in view of the risks to Hudson on the one hand, and the potential benefits to non-insider, unsecured creditors on the other hand. In *In re Certified Mortgage Corp.*, 19 B.R. 369, 370–71 (Bankr.M.D.Fla.1982), although the bankruptcy court ruled that although the secured creditor was not entitled to relief under Section 362(d)(2), it was nevertheless entitled to adequate protection:

> While an equity cushion by itself may, under certain circumstances, provide adequate protection, this is not so, especially when the Debtor does not show a sincere desire to speedily effectuate a reorganization, when the delays are inordinate and unreasonable, when a plan is a liquidation plan and where the sole hope of the Debtor to effectuate the reorganization is to salvage the equities in its properties, the success of which depends on economic factors over which the Debtor has no control. As far as the Debtor is concerned, time is not of the essence, but time is clearly of essence as far as a secured creditor is concerned

who is deprived of the use of its collateral, deprived of income and who must pay its own bills in order to survive. The proposition that the Debtor may use the automatic stay indefinitely as a refuge without proceeding speedily to a confirmation is simply not the law. It would be a gross abuse of discretion to continue to protect the Debtor indefinitely just because it has equity in its encumbered properties. The argument that secured creditors are not harmed by delays if there is an equity cushion or if the properties are not exposed to jeopardy is merely telling one-half of the story.

*See also In re King*, 305 B.R. 152, 175 (Bankr.S.D.N.Y.2004) (cause for relief from stay where "no evidence of any reorganization activity" in the case). The conditions described in the *Certified Mortgage* case are present here. The obvious goal of the reorganization is not an effort to repay the few non-insider creditors but an effort to salvage the investments of Mr. Boehm and other insiders. The Debtors have conceded that the success of the reorganization depends on economic factors over which they have no control. Boehm Aff., ¶ 39. Where, as here, the Debtor cannot provide adequate protection, the stay must be lifted.

### Allegations of Bad Faith

 Hudson relies on *In re C–TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir.1997), in which the Second Circuit adopted an eight-factor test as "indicative of a bad faith filing."[7] Yet the Second

---

7. The factors, first set forth in *Pleasant Pointe Apartments, Ltd. v. Kentucky Hous., Corp.*, 139 B.R. 828, 832 (W.D.Ky.1992) are:
 1. The debtor has only one asset;
 2. The debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
 3. The debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

 4. The debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
 5. The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
 6. The debtor has little or no cash flow;

Circuit's ruling in *C–TC 9th Ave. P'ship,* which sustained the bankruptcy court's *sua sponte* dismissal of a Chapter 11 case also relied on a finding by the bankruptcy court that the debtor knew there was no reasonable probability that it would ever emerge from bankruptcy yet "chose to file the petition anyway," and that the debtor's main purpose in filing its Chapter 11 petition was to stay state court proceedings and "relitigate in the bankruptcy forum the matters that had been settled in the state court." *Id.* at 1311. This case was not filed in an effort to relitigate matters already decided by a state court, nor is it clear to this Court that the Debtors knew when the case was filed that there was no possibility of reorganization. This Court's ruling is not based upon the finding that the Debtors acted in bad faith, but, as is typical in many small Chapter 11 cases, in an excess of optimism that was not supported by sufficiently diligent efforts to reorganize in a speed and manner that would not prejudice its secured creditors.

■ Hudson also urges the Court to lift the stay for cause due to the Debtors' post-petition conduct. The question is a close one. A good deal of the Debtors' conduct during the course of this case has been regrettable. After 60 days in Chapter 11 the estate was in disarray, and the Debtors squandered many opportunities afforded them by this Court and by other parties in interest. For example, the Lift–Stay motion was adjourned numerous times, and each time the Court expressed its concerns to the Debtors; yet the Debtors were no better organized at the conclusion of the evidentiary hearing on May 28, 2004 than they were at the very first hearing on the motion. Nevertheless, the Court is reluctant to rule that the Debtors' disorganization rises to the level of intentional "bad faith."

### Mismanagement of Collateral

■ Hudson argues that the Debtors have mismanaged the collateral, and that this is additional cause for relief from the stay. Hudson cites several examples, such as the *Dauntless's* inadequate insurance and lack of a cruising permit mismanagement, which formed part of the basis for the Court's finding that Hudson lacked adequate protection. Hudson also points to the fact that the costs expended in refurbishing the vessels were excessive in view of their current offering price. The *Dauntless,* currently offered at $3.25 million, was purchased in 1996 for $475,000 and "direct costs" of $3.8 million were incurred in its refurbishment. More than $850,000 has been spent to date in repairing the *Robust,* which was purchased for $1 million. Although this is further evidence of the Debtors' "pipe dream" mentality that justifies relief from the stay, the Court cannot find that this also constitutes mismanagement of the collateral without unfairly resorting to hindsight. To the Debtors' credit, there is no evidence that the vessels have been physically mistreated, or that they were improperly used by the Debtors' officers or directors for personal reasons. Mr. Klaity's description of his recent inspection of the *Dauntless* was of a ship that appeared to be in "pristine" condition.

### Denial of Stay Pending Appeal

■ At the conclusion of the Court's oral ruling lifting the stay, the

---

7. The debtor can't meet current expenses including the payment of personal property and real estate taxes; and
8. The debtor has no employees.

The Second Circuit clarified that "When the record is sufficiently well developed to allow the bankruptcy court to draw the necessary inferences to dismiss a Chapter 11 case for cause, the bankruptcy court may do so." 113 F.3d at 1312.

Debtors' sought a stay pending appeal, which was denied. To obtain a stay pending appeal, the debtor must show (1) a strong likelihood of success on the merits of the appeal, (2) that the movant will suffer irreparable injury if the stay is denied, (3) that no substantial harm will be suffered by the creditor if the stay is granted, and (4) that the stay is in the public's interest. Failure to satisfy any one of these criteria is fatal to the debtor's motion. *See In re 1567 Broadway Ownership Assocs.*, 202 B.R. 549, 552–553 (S.D.N.Y.1996) ("when a debtor facing imminent foreclosure of real property seeks to stay the foreclosure sale pending appeal of an order lifting the automatic stay, courts have refused to stay that order when the debtor could not demonstrate a strong likelihood of success of appeal."). For the reasons set forth at length in this decision, the Debtors' likelihood of success on appeal is doubtful, and Hudson would be substantially harmed. The Court found that Hudson made a *prima facie* showing that cause existed to lift the stay on multiple grounds, largely based upon facts to which the parties stipulated. The Debtors did not provide any persuasive evidence in rebuttal.

## CONCLUSION

The foregoing decision is in keeping with the Court's oral ruling at the May 28, 2004 hearing and the June 2, 2004 order granting relief from the automatic stay.